**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT COURT OF PENNSYLVANIA**

| | |
|---|---|
| BRYAN R. KATZ and KRISTINE J. CONCEPCION,<br><br>              Plaintiffs,<br><br>       v.<br><br>TIMOTHY S. DELUCA, a/k/a TIM DELUCA, DJSE EQUITES, LLC and GREAT AMERICAN ABSTRACT, LLC,<br>              Defendants. | **CIVIL ACTION**<br><br>**Case No.: 23-cv**<br><br><br>**JURY TRIAL DEMANDED**<br><br><br>**COMPLAINT** |

Plaintiffs Bryan R. Katz and Kristine J. Concepcion (hereinafter collectively referred to as "Katz" or "Plaintiffs"), by and through their attorneys, Gordin & Berger, P.C., hereby file this Complaint and Jury Demand for damages against Defendants Timothy S. DeLuca a/k/a Tim DeLuca (hereinafter "DeLuca"), DJSE Equities, LLC (hereinafter "DJSE") and Great American Abstract, LLC, (hereinafter "Great American") for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq*, for violations of various state common laws, and breach of a title insurance contract and bad faith. In support thereof, Plaintiffs allege the following:

INTRODUCTION AND SUMMARY OF CLAIMS

1.      The genesis of the present action concerns a real estate transaction whereby the Plaintiffs, while living, residing and working in Philadelphia Pennsylvania, bought a home located in Haddonfield New Jersey to use as their primary residence from DJSE and used Great American as the title agent to facilitate the transfer process and to both ensure and insure the proper transfer of title.

2.      As a part of that transaction, Plaintiffs purchased a standard insurance policy from Great American, to insure against any defects, liens or encumbrances, and Great American, in turn, required DeLuca to submit a sworn affidavit on behalf of DJSE, which turned out to be knowingly false, that the property was not subject to any such liens or encumbrances, including liens, encumbrances, or other legal obligations on account of unpaid taxes or fees.

3.      Several months after the transaction closed, Plaintiffs discovered, upon receiving a deficiency letter in the mail, that neither DJSE nor DeLuca had paid the entire balance that was due the township in connection with an *Affordable Housing Development Fee*, the equivalent of a municipal tax that is assessed to certain "developers" that is based on the increase in value of the developments made to real property within the township, and contacted Great American requesting that it perform under the insurance contract.

4.      Great American, thereafter, acknowledged its responsibility and took initial steps to indemnify the Plaintiffs and hold them harmless by contacting DJSE and DeLuca and demanding that they satisfy this tax obligation, directing DJSE and DeLuca to the affidavit that was submitted swearing that all such legal obligations had been satisfied.

5.      Specifically, Great American threatened DJSE and DeLuca with a lawsuit, or at least that they would refer the matter "to [Great American's] attorney if [it] is not... resolved by the seller" and DJSE and DeLuca in turn made false promises to satisfy the tax obligation by contacting the tax collector and instructing their real estate agent to assure Great American and the Plaintiffs that it would be satisfied.

6.      However, once DeLuca's and DJSE's fraudulent intent became apparent, Great American reneged on its promise to perform under the insurance contract and repeatedly ignored

the Plaintiffs' demands therefore, failing to satisfy the obligation from its own assets or retaining its own attorney to seek legal recourse from DJSE and/or DeLuca.

7.        Instead, upon realizing that performance of its obligations under the insurance contract would require more than a few threatening emails to DJSE and DeLuca's real estate agent, Great American strung along the Plaintiffs for nearly two years, and eventually just went silent, in the hopes that Plaintiffs would either not be able to find an attorney that was willing to take on their case, or that by the time they did find an attorney any claims would be stale, and Great American would be able to avoid performance by pretending that it would perform for just long enough that it could make it someone else's problem.

8.        Thereafter, upon finally being referred to Gordin & Berger, P.C., Plaintiffs now bring the within action against all appropriate parties based on the following authorities:

9.        The RICO Act provides for a private right of action to any person that is injured in his business or property as a result of any violations of the statute, and any person, associated with an "enterprise" who conducts the enterprise's affairs through a pattern of racketeering activity may be liable to the injured party for damages. See, 18 U.S.C. §§ 1962(c) and 1964(c).

10.       In the present case, DJSE is an enterprise operating as a real estate investment business, and the enterprise's activities are carried out primarily by its sole member, DeLuca.

11.       Thus, where DeLuca conducted the enterprise's affairs through a pattern of racketeering activity as described herein, Plaintiffs bring this action for actual (direct), special (consequential), statutory, and punitive damages arising under the RICO Act.

12.       Additionally, Plaintiffs also maintain that DJSE is vicariously liable for RICO violations based on the conduct committed by its sole member, DeLuca, and in the alternative assert claims for common law fraud against DJSE based on the same conduct.

13.     Finally, Plaintiffs also assert certain claims for actual (direct), special (consequential), and punitive damages arising under Pennsylvania Common Law and 42 Pa.C.S.A. § 8371 for Great American's breach of an insurance contract and bad faith conduct.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, and 18 U.S.C. §§ 1964(a) – (c) as this matter is an action arising under the laws of the United States.

15.     Further, this Court has subject matter jurisdiction pursuant 28 U.S.C. § 1332 where there is complete diversity among the parties and the amount in controversy exceeds $75,000, where statutory attorneys' fees and costs are considered part of the amount in controversy "if such fees are available to successful plaintiffs under the statutory cause of action" pursuant *Suber v. Chrysler Corp.*, 104 F.3d 578, 585 (3d Cir. 1997) and both primary claims provide for the recovery of fees and costs to successful plaintiffs under 18 U.S.C. § 1964(c) and 42 Pa.C.S.A. § 8371(3).

16.     Finally, this Court has subject matter jurisdiction over the supplemental state law claims pursuant to 28 U.S.C. § 1367.

17.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and/or omissions giving rise to this action occurred in the Eastern District of Pennsylvania.

18.     Alternatively, venue is proper in this district under 28 U.S.C. § 1391(b)(1), where Great American resides in this district and where DJSE and DeLuca possess sufficient contacts with this District to be deemed to reside in this district under 28 U.S.C. § 1391(c)(2)  subject to

the Commonwealth of Pennsylvania's personal jurisdiction with respect to this action pursuant to 42 Pa.C.S.A. §§ 5308 and 5322(a)(4).

### JURY DEMAND

19.     Plaintiffs demand a jury trial on all issues.

### PARTIES

20.     Plaintiffs, Bryan R. Katz and Kristine J. Concepcion are husband and wife, natural persons, and are presently residents of Camden County, in the State of New Jersey.

21.     Defendant Timothy S. DeLuca a/k/a Tim DeLuca, is a natural personal and resident of the State of North Carolina.

22.     Defendant, DJSE Equities, LLC, is an LLC organized and existing under the laws of New Jersey, with a single member, Defendant DeLuca.

23.     As an LLC, DJSE is a citizen of all of the states to which its members are citizens of, and where DeLuca is the sole member of DJSE, DJSE is, therefore, a citizen of the State of North Carolina.

24.     Great American Abstract, LLC, is an LLC organized and existing under the laws of the Commonwealth of Pennsylvania.

25.     Based on information and belief, all of the members of Great American are citizens of Pennsylvania, and Great American therefore, is a citizen of Pennsylvania.

26.     Non-party, Fiona Curran (hereinafter "Curran") is an employee and agent for Great American who was at all times relevant hereto, acting within the scope of her agency and employment at Great American with actual authority.

27.     Non-party Megan Giordano is a tax collector for the borough of Haddonfield New Jersey.

GENERAL FACTUAL BACKGROUND

*New Jersey's Property Tax Scheme & Applicable Terminology*

28.     Property taxes in New Jersey are, generally speaking, based on a property's "assessed value" which is essentially just the figure that the tax assessor comes up with when he determines the value of a landowner's real estate for purposes of assessing the owner's property tax bill for the year.

29.     It is customary for this to be done during the fall, and at some point during September or October, the appropriate entity, upon processing of the reassessments for the jurisdictional unit (township), will send an invoice reflecting the updated assessed value to the property owner further indicating that the owner has certain rights to appeal the determination by a date certain in December under applicable law.

30.     As part of an effort, however, to ensure that property owners throughout the state are paying their fair share, another state entity tracks and aggregates all of the property sales data over a 12 month period for each town, and then each county will publish a table that reflects this data on a town by town basis in order to show the "true value" of real property within a town relative to the assessed values, set forth as a percentage, which is known as the "equalization ratio."

31.     The equalization ratio, therefore, will be published by March 1, or May 15, and each individual property owner will be able to see to what extent the assessed value of his or her property is inconsistent with its "true value" by consulting the published tables upon receiving his assessment several months later in the fall, and where the percentage with respect to the property owner's town is less than 100%, this would indicate that the assessed value of his property is likely **below** the property's "true value" commensurate with the percentage factor.

32.     Further, a property's "equalized assessed value" therefore is determined by dividing the assessed value by the equalization ration that is reflected in the published tables and in the case of the Borough of Haddonfield, for the year 2020, the equalization ratio was calculated to be 94.85%.

33.     Thus, when a property owner in Haddonfield received his assessment in the fall of 2020 for that year, he could easily consult published equalization tables and see that his assessed value was calculated to be less than the property's "true value" based on the applicable equalization ratio of 94.85%.

34.     The "equalized assessed value" of property is the same as the "true value" of the property, and is therefore calculated by dividing the assessed value of the property by the applicable equalization ratio, and that total amount is the property's "equalized assessed value." Thus, if a property in Haddonfield received an assessment indicating an assessed value of $100,000, that property's "equalized assessed value" would be $105,429.63 based on the 94.85% equalization ratio.

### *The Affordable Housing Development Fee*

35.     Pursuant to Chapter 63 of the Haddonfield Code of Ordinances, the borough of Haddonfield implemented an *Affordable Housing Development Fee* (hereinafter the "Fee") on all new residential and commercial real estate developments that is designed to encourage the development of affordable housing by providing for an exemption from the Fee to developers that provide low and moderate income housing units on the developed sites.

36.     The Fee is assessed based on the increase in value of the property, however, the increase in value is calculated based on the "equalized assessed value" and not the assessed value, by taking one and one half percent (1.5%) of the *increase* in the "equalized assessed

value" in the case of residential property, or two and one half percent (2.5%) in the case of a commercial property.

37.     Because the amount of the Fee is typically not calculated until after the completion of the development/improvements, "the property owner must estimate to the best of his/her ability, the change in the equalized assessed value and the development fee" and the borough further provides a form that includes a "guide to estimate[ing] the increase in equalized assessed value" by explaining that for a new house it should be estimated as "the proposed sale price minus the market value of the land" and for additions or renovations, it should be estimated based on "[t]he construction cost[s]... include[ing] all of the labor" but further cautions that the estimate will "probably be low" if the owner "perform[s] the work without a contractor."

38.     A true and correct copy of an Affordable Housing Development Fee Form (hereinafter the "Fee Form") has been attached hereto as **EXHIBIT 1** and is the specific Fee Form that a developer is required to fill out and submit in order to proceed through the permitting process in order to complete any construction.

39.     As is indicated therein, the borough utilizes a three step process for assessing and collecting the Fee as set forth in more detail below, however the gist of this process requires the owner or developer to make a good faith estimate of the amount, to pay half of the estimate during the construction permitting/approval process, pay the second half of the estimate after completion of the construction during the certificate of occupancy process, and a final step consisting of properly accounting for any overpayment or underpayment in the Fee contemporaneously with the township's tax assessment process.

40.     Thus, when the developer receives his reassessment in October, the invoice will include an assessment amount that is based on the property's assessed value, and will therefore

cover the necessary information for the developer to ascertain the actual total of the Fee, by taking the increase in the assessed value as reflected on his tax statement, dividing it by the equalization ratio that was published several months prior in March or May, and multiplying that amount by either 1.5% or 2.5% for a residential or commercial property, respectively.

41.     Indeed, the method/formula that is used for this calculation is set forth on the Fee Form that a developer/owner is required to complete. See **EXHIBIT 1**.

42.     As noted, step one of that process requires that the first half of the Fee based on the estimated increase in equalized assessed value is paid as part of the permitting process for obtaining proper permission to commence construction on the property. And, in submitting this first payment and in order to obtain any construction permits an owner/developer is required to complete the two page Fee Form, which contains instructions for describing the three step process and for making the appropriate estimates and further requires the owner/developer to submit a sworn certification (hereinafter the "Owner Certification") which states as follows:

> "I hereby certify I have read the entire form; and my estimate of the increase in equalized assessed value is correct to the best of my knowledge; and I understand the three step process to determine, collect and/or credit the fee; and that occupancy of the structure is not permitted until the certificate of occupancy (CO) or certificate of approval (CA) is issued and failure to pay any fee due as determined by the tax assessor ***could result in a lien being placed on the property***." (**EXHIBIT 1**, emphasis added)

43.     Step two of that process requires that the owner pay the second half of the Fee based on the estimated increase in equalized assessed value in order to obtain a Certificate of Occupancy, which is a necessary certificate in order to sell the residential property.

44.     Because it is the borough's Construction Office, and not the office of the Tax Assessor/Collectors, that collect the initial payment towards the Fee, contemporaneously with their receipt of the Fee Form and important plans and construction related documents for the

permitting process, the Fee Form with a properly signed Owner Certification is not always necessarily kept in the borough's file, and in such a case, where the Fee Form is not present, the developer/owner will be required to submit the Fee Form and the properly executed Owner Certification contemporaneously with making the second payment, which will necessarily evidence the owner's understanding of the three step process, that he utilize the guidelines for making the estimate and that the estimate is correct to the best of his knowledge and the requirement that he pay any amounts that are still due and owing, upon receipt of his property tax assessment invoice, allowing him an opportunity to dispute both the portion of his tax assessment and the amount of the Fee by filing an appropriate appeal before the deadline in December.

45.     Finally, once the developer/owner's time to appeal has passed and the amount of the assessment, and the correlated amount of the increased assessment, becomes final, the tax assessor will complete the second page of the Fee Form calculating the total still due or any amounts that are owed to the developer on account of an overpayment, and send a separate invoice to the developer/owner for that amount.

46.     However, the initial onus for paying the correct amount is placed on the developer to exercise good faith in properly estimating the increased value in accordance with the guidelines contained on the second page of the Fee Form.

### FACTUAL ALLEGATIONS

47.     DJSE is a real estate investment business and is an enterprise, as defined by 18 U.S.C. § 1961(4).

48.     DJSE's real estate investment business is engaged in, or affects, interstate commerce.

49.     Specifically, DJSE only has one member, DeLuca, who, based on information and belief, lives and resides in North Carolina, the same state where DJSE maintains its principal place of business, however, DJSE was organized and registered as an LLC under the laws of the State of New Jersey, registering to conduct business activities therein.

50.     Additionally, in order to conduct the affairs of DJSE's real estate investment business, DeLuca would regularly send and receive communications across state lines communicating through the mails and by wires.

51.     By way of illustration, in order to complete the instant transaction, DeLuca reviewed and signed an Affidavit of Title before a notary public located in North Carolina, and then mailed the Affidavit to Great American located in Philadelphia Pennsylvania, or to the office of his realtor in New Jersey, who then transmitted the same by mail or by the wires to Great American located in Philadelphia Pennsylvania.

52.     Finally, DJSE has also since registered as a foreign LLC under the laws of the state of Texas, and has apparently moved the entity's registered office to an address in Texas, and accordingly, DJSE's activities affect interstate commerce.

53.     On or about November 15, 2017, DJSE, through DeLuca, bought a property located in Haddonfield NJ, identified by Block 11.12 Lot 5, and with an address of 249 Wayne Avenue, Haddonfield NJ 08033, (hereinafter the "Haddonfield Property"), for the purposes of developing and flipping the property at a profit, as a part of its real estate investment business.

54.     The purchase price of the property was $365,000, and shortly thereafter DJSE began its efforts to develop the property.

55.     Specifically, on December 27, 2017, just over a month after purchasing the Haddonfield Property, DJSE through DeLuca, submitted construction applications to the borough's Construction Office, and was advised at that time of the associated Fee.

56.     Specifically, based on information and belief, DeLuca completed the requisite Fee Form, and despite his obligation to provide a good faith estimate for the cost of the construction, DeLuca knowingly and intentionally underestimated and underpaid the first half of the Fee, and arbitrarily estimated the increase in the equalized assessment value of the property to be $50,000 and then submitted a payment for $1,250.00 knowing that this amount was well below 50% of the amount of the Fee that would be due.

57.     However, this document, for one reason or another not related to this action, was not properly kept and retained by the borough's Construction Office, although the $1,250.00 payment that was received was properly recorded.

58.     For unknown reasons, construction on this particular project took a very long time, and it is possible that change-over of personnel within the borough's Construction Office would explain the missing Fee Form as well as the delays.

59.     During the interim, on or about February 5, 2018, DJSE bought another property located in Mount Laurel, New Jersey for a purchase price of $96,000 and was subsequently able to complete the rehab and construction for that property much more quickly and eventually was able to "flip" that Mount Laurel property at a substantial profit, closing on that sale on or about July 13, 2018 for a purchase price of $225,000.

60.     Construction and development of the Haddonfield Property was eventually completed in the summer of 2020, and in September or October while seeking to obtain a Certificate of Occupancy in order to sell the Property, DeLuca learned that although they had a

record of the payment, the Construction Office was not able to locate a copy of the Fee Form, and was advised that he would have to complete another one.

61.     Thereafter, on October 15, 2020, DeLuca issued another check in the amount of $1,250.00 and either completed a new Fee Form, or located a copy that he had originally filled out, and re-executed and/or ratified same by providing the date and assenting to the Owner Certification, reaffirming the bogus estimate.

62.     Specifically the directions state that the estimate should be based on either the expected sale price, or the full costs of construction including labor, and DeLuca certified that his estimate of only an additional $50,000 was correct based on his knowledge of either the expected sale price and/or the full costs of construction including labor.

63.     And, DeLuca certified to the truth of those representations at a time that he knew what the total construction costs were, having completed the same months prior, and had already listed the property at a price that was $225,000 above the initial purchase price.

64.     Attached hereto as **EXHIBIT 2** is a true and correct copy of the Fee Form that was executed and/or re-executed by DeLuca (on behalf of DJSE) on October 15, 2020, together with another copy of the first page thereof date stamped received by the borough, the check for another $1,250.00, and then the completed calculations of the Tax Assessor on the second page of the form.

65.     Importantly, as seen in **EXHIBIT 2**, the Haddonfield Property was reassessed by the tax assessor as having an "Increase in Assessed Value of $288,500" which was almost six (6) times the $50,000 that was "estimated" by DeLuca.

66.     Contemporaneously with submitting this October 15, 2020 Fee Form, and a second payment totaling $2,500.00 towards the Fee, DJSE, through DeLuca, applied for, and was issued, an appropriate Certificate of Occupancy.

67.     And on or about October 21, 2020, a few days after submitting the Fee Form, invoices were sent out by the borough indicating the reassessment had been completed and setting forth the assessed value of the Haddonfield Property.

68.     Specifically, the borough's tax collector, Megan Giordano (hereinafter "Giordano" or the "tax collector"), has stated that this reassessment specifically notified DeLuca and DJSE of the fact that the increase in assessed value of the Haddonfield Property was determined to be $288,500.00, with a prior assessed value of $333,300.00, and a reassessed value of $621,800.00.

69.     Moreover, Giordano also explained that in addition to receiving notification of this increase in assessed value, DeLuca and DJSE were also billed for an extra $5,000.00 (approximately) on account of this additional assessed value pro-rated based on the date that construction was completed in June.

70.     Further, Giordano explained that this invoice included the relevant notice that DJSE and DeLuca had until December 1, 2020 to file an appeal to contest the tax assessor's determination of the increase in value.

71.     And finally, based on the published equalization ratios, upon receipt of this tax invoice in October, and subsequent payment thereof of the property taxes that were due, DeLuca and DJSE knew or should have known that the amount of the increase in "equalized assessed value" was actually, $304,164.00, far more than DeLuca's bogus estimate of $50,000.00

72.     Regardless, DeLuca also knew the three step process for paying the Fee, and knew that he was responsible for paying the full amount, which almost doubled the $2,500 that he had paid based on the bogus estimate.

73.     Finally, as evidenced by the Owner Certification, DeLuca knew that the failure to pay the full amount of the Fee "could result in a lien being placed on the property."

74.     Despite this knowledge, however, on November 25, 2020, DeLuca executed, on behalf of DJSE, a Deed and Affidavit of Title, containing material misrepresentations about the existence of a legal interest against the property based on the unpaid portion of the Fee.

75.     Attached hereto as **EXHIBIT 3**, is a true and correct copy of the Deed and Affidavit of Title that was executed by DeLuca on behalf DJSE, while DeLuca was located in the State of North Carolina, and notarized by an appropriate notary public therein.

76.     Specifically, as seen on the second page of the Deed, DeLuca falsely "promise[d] that [DJSE] has done no act to encumber the Property" and that "[t]his promise means that [DJSE] has not allowed anyone else to obtain any legal rights which affect the Property." See **EXHIBIT 3**.

77.     Similarly, in paragraph 3 of the Affidavit of Title, DeLuca falsely stated that DJSE "ha[d] not allowed any interests (legal rights) to be created which affect [DJSE's] ownership or use of" the Haddonfield Property. See **EXHIBIT 3.**

78.     Then again, in paragraph 5 of the Affidavit of Title, DeLuca falsely stated that "[n]o one has notified [DJSE] that money is due and owing for construction, alteration or repair work on" the Haddonfield Property. See **EXHIBIT 3**

79.     Then again, in paragraph 6 of the Affidavit of Title, DeLuca falsely stated that "[t]here are no pending lawsuits or judgments against [DJSE] **or other legal obligations, which may be enforced against this property**." See **EXHIBIT 3** (emphasis added).

80.     And then finally, in paragraph 7 of the Affidavit of Title, DeLuca knowingly omitted the unpaid Fee from the list, which was left blank, which read that "[t]he following is a complete list of exceptions and additions to the above statements. This includes all liens or mortgages, which are not being paid off as a result of this sale for which the buyer is taking title subject to." See **EXHIBIT 3**.

81.     Subsequent to executing this Deed and Affidavit of Title on behalf of DJSE that contained numerous material misrepresentations and was designed to conceal the existence of the unpaid portion of the Fee, DeLuca transmitted the same by mail or by the wires to Great American's office in Philadelphia, or did so indirectly through its realtor's office located in New Jersey.

82.     Thereafter, upon receipt of this fraudulent Deed and Affidavit of Title, Great American went ahead processing the closing and settlement of the purchase of the Haddonfield Property by the Plaintiffs which took place on December 7, 2020.

83.     Importantly, Great American also charged the Plaintiff's the following fees, in connection with the title insurance policies and the obligations under the policies to ensure that title was transferred without any encumbrances, including the instant unpaid Fee:

      a.     Great American charged the Plaintiffs $2,445.00 to issue a title insurance policy with the Plaintiff's Mortgagee as the beneficiary;

      b.     Great American charged the Plaintiffs $424.00 to issue a title insurance policy with the Plaintiff's as the beneficiary; and

c.      Great American charged the Plaintiffs $35.00 to perform a "tax & assessments" search in order to confirm that all taxes and assessments that were then due and owing had been paid, notwithstanding the fact that instead of conferring directly with the borough's tax collector, Great American simply relied on DeLuca's Affidavit of Title.

84.     On the same day that the closing was processed, the tax assessor completed the Fee Form, which is customary to do only after the appeal period to contest a reassessment has expired. See **EXHIBIT 2**.

85.     Two days later, on December 9, 2020, Giordano, or another person in her office (or automated process), generated an invoice itemizing all of the figures that were known, or should have been known to DJSE and DeLuca, upon receipt of the October 21 assessment which he paid without protest:

a.      The Increase in Assessed Value was $288,500.00;

b.      The Equalization Ratio for Haddonfield was 94.85%;

c.      The Increase in Equalized Assessed Value, calculated by dividing $288,500 by 94.85%, was $304.164, which was the amount subject to the Fee;

d.      The total amount of the Fee based on the residential Fee rate of one and one half percent (1.5%) was $4,562.47;

e.      The total amount that DJSE had paid towards the Fee was only $2,500.00; and

f.      DJSE and DeLuca still owed a deficiency of $2,062.47.

86.     Thereafter on December 14, 2020 Giordano sent a cover letter indicating that the final payment in accordance with the requisite third step of collecting the Fee was due and

owing, and included the December 9, 2020 invoice. A true and correct copy of this cover letter and invoice was has been attached hereto as **EXHIBIT 4**.

87.     DeLuca received this letter on December 31, 2020, and subsequently confirmed with Giordano over the phone that the amount of $2,062.47 was still due and owing on the Fee on account of DeLuca's bogus estimate.

88.     Additionally, DeLuca also provided Giordano with Curran's email address and informed her that Great American had handled the title transfer and based on information and belief Great American first received notice of a covered claim by the owner's title insurance policy on or about January 4, 2021 when Giordano reached out to Great American directly in an effort to have the unpaid Fee satisfied.

89.     Based on information and belief, Curran first notified DeLuca and DJSE, through their realtor, sometime in January or February of 2021, that payment of the entire Fee was the responsibility of DeLuca and/or DJSE as the seller of the Haddonfield Property since it was a kind of tax or municipal obligation that was due and owing prior to the date of closing on December 7, 2020.

90.     Further, based on information and belief, Curran specifically contacted DeLuca and DJSE's realtor demanding that they pay the Fee because Great American, as the Title Company that processed the transaction, was ultimately responsible for ensuring that all such legal obligations were satisfied prior to closing and would have insisted that DeLuca and DJSE pay the Fee either prior to closing, or would have withheld sufficient funds to pay the Fee during the Settlement process.

91.     Thus, Curran knew that Great American was ultimately responsible for causing the Fee to be paid by DJSE and DeLuca as the sellers, and, in connection with that obligation, required that DeLuca execute the aforementioned Affidavit of Title prior to closing.

92.     Further, this obligation was specifically in connection with a contract for title insurance.

93.     DeLuca, however, failed to pay the Fee and in March of 2021, a delinquent notice was eventually prepared by Giordano and mailed to the Haddonfield property, this time addressed to the Plaintiffs as the current legal owners of the property.

94.     Thereafter, upon receipt of this delinquent notice, the Plaintiff contacted Giordano to inquire about the Fee, and during this conversation, Giordano relayed to the Plaintiff that the Fee was supposed to have been paid by DeLuca and DJSE, and further advised the Plaintiff that Giordano had already spoken with Curran and DeLuca and DJSE's realtor, and communicated to the Plaintiff her belief, at that time, that some combination of Curran, Great American, DeLuca and DJSE would be resolving the unpaid Fee without requiring further action of the Plaintiff.

95.     Thereafter, however, neither Great American, nor DeLuca had paid the Fee, and Giordano mailed a second delinquency notice on June 10, 2021.

96.     Plaintiffs received the second notice on or about June 15, 2021, and on that day, they scanned a copy of this second notice and sent an email to Curran for the purposes of making a claim for coverage under the insurance contract.

97.     A true and correct copy of this June 15, 2021 email that was sent by the Plaintiff to Curran of Great American has been attached hereto as **EXHIBIT 5**.

98.     As seen therein, this email was sent to Curran on June 15, 2021 at 12:57 PM, and a mere six (6) minutes later, Curran forwarded the Plaintiff's email to DeLuca's realtor,

referenced the November 25, 2020 Affidavit of Title that was executed by DeLuca and specifically demanded that DeLuca, on behalf of DJSE, pay the remainder of the Fee, and specifically stated that she "will provide to [Great American's] attorney if this is not... resolved by the seller."

99.     A true and correct copy of this email from Curran that was sent on June 15, 2021 at 1:03 PM, just six (6) minutes after receiving notice of a claim from the Plaintiffs, has been attached hereto as **EXHIBIT 6**.

100.    Three minutes after threatening DeLuca, at 1:06 PM, Curran responded to Plaintiffs by acknowledging that it would "be [a] covered... claim" under the insurance contract, notifying Plaintiffs that Curran had threatened to get Great American's attorney involved if DeLuca did not pay the Fee, and advised that she would also speak to Great American's underwriter regarding the process for handling the claim.

101.    A true and correct copy of Curran's June 15, 2021 email response at 1:06 PM has been attached hereto as **EXHIBIT 7**.

102.    Within an hour or so, DeLuca caused his real estate agent to falsely promise that he would "contact [Giordano] by [the] end of [the] week to" resolve the unpaid fee, and shortly thereafter, Curran notified the Plaintiffs by way of email that was sent on June 15, 2021 at 3:34 PM that "threatening the attorney worked" and that DJSE and DeLuca were "going to pay" the Fee.

103.    True and correct copies of these June 15, 2021 emails, one from DeLuca and DJSE's agent to Curran, sent at 3:33 PM, falsely promising to pay the Fee, and the other from Curran to Plaintiffs sent at 3:34 PM stating that her threats to engage an attorney had worked, have been attached hereto as **EXHIBIT 8** and **EXHIBIT 9**, respectively.

104.    Great American, however, learned that DeLuca and DJSE had no intention of paying the Fee sometime in the fall of 2021, however, despite this knowledge, Great American did nothing other than continue to send the occasional email to DeLuca's realtor.

105.    Based on information and belief, the "underwriter" Curran was referring to in her email of June 15, 2021 was a company that Great American uses for reinsurance purposes, where Great American bears the primary insurance responsibilities under the title insurance policy, and also obtains reinsurance from another company to cover Great American's risk in the case of a covered claim.

106.    Additionally, based on information belief, any reinsurance policy that Great American had included a deductible whereby Great American would not get reimbursed for any amounts paid below the amount of the deductible and in the present case, the amount of the Fee that was still due and owing was below Great American's deductible under its reinsurance agreement.

107.    Further, because the amount of the Fee was below the amount of the deductible of Great American's reinsurance policy, Great American, in effect, had no coverage under its reinsurance policy and as a result, instead of performing under the insurance policy by paying the Fee and thereafter attempting to recover that amount from DeLuca and/or DJSE directly, or retaining its own attorney, Great American intentionally  rendered imperfect performance by instructing Curran to simply continue to demand that DeLuca pay the Fee.

108.    At the same time, however, although Great American had already acknowledged that the Plaintiffs were covered by the insurance policy and were entitled to have the Fee paid on their behalf, in order to avoid responsibility, Great American continued to take half measures by contacting DeLuca's realtor and would continue to notify the Plaintiffs that they were taking

such measures, for the purposes of stringing the Plaintiffs along and avoiding paying out the Plaintiffs' claim.

109.    Thereafter, in April of 2022, another Pennsylvania attorney that the Plaintiffs use for other legal services, as a courtesy to the Plaintiffs, contacted Curran and again sought to compel Great American's performance under the insurance contract by asking that Great American clarify its coverage position.

110.    In response, Curran stated that she was "waiting on [her] manager to get back to" her but forwarded the several emails that she had sent to DeLuca's realtor.

111.    Once again, however, Great American never formally denied coverage by issuing some kind of denial letter, and simply repeated its pattern of bad faith conduct by stringing the plaintiffs along.

112.    Thereafter, in October of 2022, Plaintiff's Counsel was eventually retained and sent Great American a demand letter, notifying it that if Great American did not pay the Fee within 60 days, Plaintiffs would be proceeding with commencing litigation, and despite numerous efforts to compel performance, Great American has refused and continued to refuse to perform under the insurance contract.

## SPECIAL DAMAGES

113.    As a direct and proximate result of the acts and omissions described herein, constituting actionable conduct under various common law theories as well as statutory violations, Plaintiffs have suffered numerous injuries in the aforesaid forms including special damages as further described.

114.    Plaintiffs have suffered pecuniary and economic injuries in the form of substantial interference with their business.

115.    Specifically, the Plaintiffs business, and the entirety of their household's income is derived from a private dental practice the Plaintiff's run together.

116.    Moreover, both Great American and defendants DeLuca were aware of the Plaintiffs business, since a part of the agreement for sale, and the mortgage application required the Plaintiffs' make certain financial disclosures about their assets and income, and during the course of those disclosures, DeLuca, DJSE and Great American all learned that the Plaintiffs' primary source of income was from their private dental practice that they run together.

117.    Thus, at the time that Great American and the Plaintiffs entered the instant insurance contract, it was foreseeable to Great American, that if it failed to perform under the insurance contract and instead intentionally rendered imperfect performance, the Plaintiff's would suffer special harm by interfering with the Plaintiff's ability to conduct the business of their dental practice, and Plaintiff's demand special (consequential) damages as are recoverable under applicable law.

118.    Further, an essential purpose, and bargained for consideration, of the instant insurance contract was peace of mind, for the Plaintiff's to know that they would not have to worry, or stress over, or be concerned about, any of the foreseeable risks that were covered by the title insurance contract specifically including the instant risk that the seller lied about paying all legal obligations that could be enforced against the property.

119.    Thus, in failing to perform under the insurance contract and forcing the Plaintiffs to have to bear the mental burdens of resolving the unpaid Fee on their own, Plaintiffs have further suffered emotional and mental injuries, including but not limited to, stress, anxiety, loss of sleep, and other intangible injuries, for which they demand special (consequential) damages as are recoverable under applicable law.

120.     Similarly, such special (consequential) damages are also recoverable against Defendants DeLuca and DJSE as the foreseeable consequences of their fraudulent and tortious conduct. Specifically, where DJSE and DeLuca falsified certain documents as described herein for the purposes of avoiding their obligation to satisfy the Fee that was enforceable against the property as a lien, and further made false promises to subsequently satisfy the Fee, the interference with the Plaintiffs' business that would stem from having to spend considerable time and effort attempting to resolve the matter, and the commensurate mental and emotional injuries as a result in connection therewith, as well as from the stress and fear of having a lien placed on their property, was necessarily a foreseeable consequence of DJSE and DeLuca's conduct, and the Plaintiff's, therefore, are entitled to recover special (consequential) damages from DJSE and DeLuca as well.

### COUNT ONE – RICO VIOLATIONS
#### (PLAINTIFFS VS. DELUCA AND DJSE JOINTLY AND SEVERALLY)

121.     Plaintiffs incorporate by reference the allegations set forth above as though the same were set forth at length herein.

122.     As set forth above, DJSE is an "enterprise" consisting of a real estate investment business whose activities affect interstate commerce.

123.     As further set forth above, DeLuca is a "person" as defined by 18 U.S.C. § 1961(3), who is associated with the enterprise and conducted its affairs through a pattern of racketeering activity.

124.     Specifically, DeLuca committed at least two acts that are defined as racketeering activity which were committed in furtherance of the enterprise's purpose:

125.     First, on October 15, 2020, DeLuca submitted the fraudulent Fee Form containing the bogus estimate and the fraudulent Owner's Certification because he knew that by either

permissible measure for estimating the increase in assessed value – expected sale price minus cost basis (i.e. cost of land and pre-existing structures) or the cost of construction including labor – the estimate of $50,000 was unreasonably low, and DeLuca did not actually believe, in good faith, that $50,000 represented either of those two numerical figures. DeLuca sent this fraudulent Fee Form through the mail for the purposes of executing on the fraudulent scheme to avoid liability for the full amount of the Fee and conceal its existence until after selling the Haddonfield Property, in violation of 18 U.S.C. § 1341 (mail fraud).

126.    Second, also on October 15, 2020, DeLuca endorsed a check for $1,250.00 and falsely represented the same as the second half payment of his good faith estimate of the Fee due. Further in either mailing the check, or even if the same was handed over in person, in causing the check to be deposited by Haddonfield's Tax collectors with the intent and expectation that this would thereafter result in signals being sent by the wires from and to various banking institutions that would effectuate the transfer of $1,250.00 from DJSE's bank account to Haddonfield's bank account with the intent of falsely representing the same as the second half payment of his total liability for the purposes of executing on the fraudulent scheme to avoid liability for the full amount of the Fee and conceal its existence until after selling the Haddonfield Property, these acts were also in violation of 18 U.S.C. § 1343, (wire fraud).

127.    Third, on November 25, 2020, DeLuca executed, on behalf of DJSE, the fraudulent Deed and Affidavit of Title, which contained at least five (5) fraudulent, materially false representations that were made specifically for the purposes of inducing reliance thereon for the purposes of executing on the fraudulent scheme to avoid liability for the full amount of the Fee and conceal its existence until after selling the Haddonfield Property.

128.    Thereafter, DeLuca sent the fraudulent Deed and Affidavit of Title through the mails or transmitted the same by wires from North Carolina where the Affidavit was notarized, to Great American's offices in Philadelphia Pennsylvania, either directly, or through its realtor's offices in New Jersey, for the purposes of executing on the fraudulent scheme to avoid liability for the full amount of the Fee and conceal its existence until after selling the Haddonfield property.

129.    Fourth, on December 7, 2020, DeLuca, on behalf of DJSE, and through his real estate agent that was acting pursuant to DeLuca's specific directions and instructions, electronically signed a fraudulent Settlement Statement that specifically omitted the remainder of the Fee that was due from DJSE at closing based on the continued concealment thereof, and DeLuca's fraudulent omissions and misrepresentations about the existence of the Fee that was then due and owing in November 25, 2020, Deed and Affidavit of Title.

130.    A true and correct copy of this fraudulent Settlement Statement that was executed by DeLuca's agent on December 7, 2020 has been attached hereto as **EXHIBIT 10**.

131.    Specifically, as seen therein the fraudulent Settlement Statement, which was prepared in reliance on DeLuca's fraudulent Deed, and Affidavit of Title, omitted as a line item the remaining portion of the Fee, that was then due and owing, in the amount of $2,062.47 and as a result, the totals reflected on the materially false Settlement Statement falsely indicated that the total amount due at closing from DJSE to Great American to complete settlement, was only $230.79, when it should have been $2,293.26.

132.    Further, this fraudulent Settlement Statement was transmitted via the wires and was signed on behalf DeLuca and DJSE for the purposes of executing on the fraudulent scheme to avoid liability for the full amount of the Fee, and for the purposes of causing Great American

to process the Settlement and, ultimately, to send payment to DJSE's lender, Tioga Franklin Savings Bank, in the amount of $686,902.96 to satisfy a mortgage obligation that was owed by DJSE.

133.    Fifth, sometime subsequent to the December 7, 2020 closing, DeLuca did indirectly cause Great American to transmit signals via the wires ultimately resulting in a payment in the amount of $686,902.96 to be transmitted to DJSE's lender, Tioga Franklin Savings Bank, which was again conducted for the purposes of executing and completing the fraudulent scheme to complete the transaction regarding the sale of Haddonfield Property without DJSE or DeLuca having to pay the full amount of the Fee, thereby allowing DJSE to utilize additional proceeds equal to the amount of the Fee for the purposes of new real estate investments in the course of DJSE's real estate investment business.

134.    Sixth, after DeLuca had received several demands from Giordano for the remaining balance that was due on the Fee, and after Curran specifically directed DeLuca's attention to the fraudulent Affidavit of Title, DeLuca caused to be transmitted to Curran, by way of his real estate agent, signals over the wires which falsely promised to contact Giordano for purposes of paying the Fee that was due. This email containing the false promise was transmitted on June 15, 2021 at 3:33 PM. See **EXHIBIT 8**.

135.    Once again, the purpose of this email, amounting to signals sent via the wires, was to execute on the fraudulent scheme of avoiding payment of the Fee, specifically, DeLuca instructed his agent to make this false promise to Curran so that he could get DJSE's affairs in order and secret any remaining assets beyond the reach of either New Jersey or Pennsylvania courts.

136.    Seventh, after instructing his agent to send the email with the false promises, DeLuca thereafter called Giordano on June 15, 2021, and utilizing electronic to signals to communicate with her, did falsely state that he would be sending a either a Certified Check or Cashier's Check directly to Giordano for the full amount of the unpaid Fee, which was also for the purposes of executing on the fraudulent scheme to avoid payment of the Fee. Specifically, DeLuca made this false promise to Giordano knowing that this false promise would also be communicated to the Plaintiffs and would further allow DeLuca additional time to get DJSE's affairs in order and secret any remaining assets beyond the reach of either New Jersey of Pennsylvania courts.

137.    Finally, on or about November 12, 2021, after DeLuca had secreted any remaining assets of DJSE beyond the reach of NJ or Pennsylvania courts and DeLuca believed he was safe from any consequences, DeLuca finally notified Giordano that he was refusing to pay the Fee for the purposes of completing fraudulent scheme by indirectly causing Giordano to demand payment from the Plaintiffs under threat of enforcement through a lien against the Haddonfield Property.

138.    This final communication also transpired over the phone, and relied on the electronic transmission of signals across the wires.

139.    Thus, DeLuca, who is a person associated with an enterprise, conducted the enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), with his commission of eight instances of racketeering activity between October 15, 2020 and November 12, 2021.

140.    Further, Plaintiffs were injured in their business and property as a direct and proximate result of the aforementioned racketeering activities – specifically Plaintiff's suffered

out of pocket costs in the amount of the unpaid Fee in order to avoid a lien being placed against the Haddonfield Property, and further Plaintiff's suffered injuries to their business based on the substantial interference with their business from having to consult with Giordano to learn about the Fee and resolve the matter so as to avoid a lien against their property, as well as the aforementioned mental and emotional injuries.

141.    Accordingly, Plaintiffs bring this suit for damages against DeLuca under 18 U.S.C. § 1964(c).

142.    Additionally, DJSE is also a "person" as defined by the RICO Act, and is vicariously liable to the Plaintiffs for damages.

143.    Alternatively, for purposes of impugning RICO liability for violations of 18 U.S.C. § 1962(c) against DJSE, the RICO enterprise consists of an Association-in-fact enterprise between DJSE and DeLuca, and where DJSE, which can only act through its agents, is vicariously liable for the injuries sustained by the Plaintiffs on account of the racketeering activity that was committed by DeLuca on DJSE's behalf.

144.    As a result of the violations of the RICO Act by DeLuca, individually and on behalf DJSE, identified herein, DeLuca and DJSE are liable to the Plaintiffs, jointly and severally, for damages to include: statutory damages, actual damages, special damages, punitive damages, costs of this action and attorney's fees.

## COUNT TWO – COMMON LAW FRAUD
### (PLAINTIFFS VS. DELUCA AND DJSE JOINTLY AND SEVERALLY)

145.    Plaintiffs incorporate by reference the allegations set forth above as though the same were set forth at length herein.

146.    At all times relevant hereto, DeLuca was the only member and agent for DJSE, and the sole owner, and officer thereof, and where DJSE as a legal entity, can only act through

its agents, DeLuca and DJSE are, for purposes of this Count for Common Law Fraud, alter egos of each other and share liability for the acts described herein jointly and severally.

147.    As a direct and proximate result of the material misrepresentations described above, specifically, including the fraudulent omissions from the November 25, 2020 Deed and Affidavit of Title regarding the unpaid amount of the Fee that was then due and owing, the Plaintiffs did proceed with completing the sale transaction and taking title to the Haddonfield Property which included along with it, a legal obligation to pay the remaining portion of the Fee.

148.    Further, the Plaintiffs were justified in relying on those false representations, and it was specifically foreseeable that they would rely on those false representations since reliance on the truth of those statements was expressly recited in the Affidavit of Title.

149.    Similarly, it was an essential and material term of the transaction that **all** liens, encumbrances, or legal obligations of any kind would be satisfied by the Defendants as the sellers, either prior to, or immediately after closing directly from the sale proceeds, such that perfect title would pass to the Plaintiffs.

150.    Accordingly, where this representation that perfect title would pass to the Plaintiffs was false, but material to the transaction, whether or not Defendants knew and specifically intended to misrepresent  this fact, is irrelevant to a claim of common law fraud under Pennsylvania law.

151.    Finally, as a direct and proximate result of the Defendant's misrepresentations, Plaintiffs were injured by unwittingly assuming liability for the Fee by virtue of their ownership of the Haddonfield Property.

152.    Accordingly, as a direct result of the Plaintiffs' reliance on the within described fraudulent utterances of DeLuca, individually and on behalf DJSE, DeLuca and DJSE are liable

to the Plaintiffs, jointly and severally, for damages to include: actual damages, special damages, punitive damages, costs of this action and attorney's fees.

## COUNT III – BREACH OF INSURANCE CONTRACT
### (PLAINTIFFS VS. GREAT AMERICAN)

153.    Plaintiffs incorporate by reference the allegations set forth above as though the same were set forth at length herein.

154.    As set forth above, the underlying real estate transaction specifically involved a title insurance contract whereby Great American was responsible for ensuring the perfect transfer of title that was clear of any and all encumbrances, liens, or other legal obligation.

155.    Specifically, insuring against this risk benefitted both the Plaintiffs and the bank from which the Plaintiffs obtained a mortgage in order to complete the sale.

156.    As noted above, one policy named the Mortgagee as the beneficiary and protected the Mortgagee's interest by ensuring perfect title was transferred such that no liens, encumbrances or other legal obligations could take priority over the mortgage security interest and the Plaintiffs paid the single premium for this policy.

157.    Additionally, another policy also named the Plaintiffs as the beneficiary to protect their financial interests in any equity in the Haddonfield Property by again ensuring perfect title was transferred such that no liens, encumbrances or other legal obligations could cloud marketable title to the property or reduce their equity in the property if the obligation was junior to the primary mortgage.

158.    Specifically, Great American took certain steps to make sure that perfect title was transferred, however, as was revealed by the fraudulent nature of the Deed and Affidavit of Title,

Great American did not do a good enough job, but ultimately bore the responsibility for assuming that risk up to the policy limits.

159.   As was set forth above, Great American legally admitted to being responsible for indemnifying the Plaintiffs and holding them harmless against any losses or injuries on account of the liability to Haddonfield Township to pay the Fee, and initially attempted to perform.

160.   However, as explained above, because the amount of loss fell below the threshold of Great American's deductible for any reinsurance agreement that Great American had with another entity, Great American intentionally, and knowingly rendered imperfect performance hoping to convince DeLuca and DJSE to voluntarily pay the Fee and thereafter string along the Plaintiffs when it became clear that Great American would have to pay the Fee from its own assets.

161.   Despite numerous and repeated attempts to compel performance under the insurance contract, Great American has refused and continues to refuse.

162.   Moreover, Great American has acted arbitrarily, and without justification, and specifically in bad faith, where Great American intentionally, and knowingly rendered imperfect performance over a period of nearly two years, ultimately forcing the Plaintiffs to incur significant expense and other injuries based on the breach of the instant insurance contract.

163.   Further, as a direct and proximate result of Great American's refusal to perform under the title insurance contract, Plaintiff has suffered actual and special damages in the forms described herein.

164.   Moreover, where such special (consequential) damages was necessarily foreseeable to Great American at the time that the parties entered into the instant insurance

contract based on Great American's knowledge of the Plaintiffs' source of income, Plaintiffs are entitled to such damages as well.

165.    Further, the underlying title insurance contract was made between two parties that were both citizens of Pennsylvania, since Great American is a resident of Pennsylvania and Plaintiffs were also residents of Pennsylvania at the time that they entered into the contract, and where the parties also conducted their dealings in the Commonwealth of Pennsylvania and further consummated the transaction at Great American's office located in Philadelphia Pennsylvania, the underlying insurance contract would be subject to Pennsylvania law, specifically including 42 Pa.C.S.A. § 8371.

166.    Thus, as a result of Great American's willful and intentional breach of the insurance contract identified herein, Great American is liable to the Plaintiffs for damages to include: statutory damages, actual damages, special (consequential damages), punitive damages, costs of this action and attorney's fees.

## PRAYER FOR RELIEF

Plaintiffs request judgment in their favor and against all Defendants as to the respective Counts for damages to include, statutory damages, actual damages, special damages, punitive damages, costs of this action, reasonable attorney's fees and such other relief as this Court deems just and proper.

Respectfully submitted,

*Gordin & Berger, P.C.*

Dated:  March 28, 2023

_/s/ Daniel A. Berger_____
Daniel A. Berger (319631)
GORDIN & BERGER, P.C
1760 Market Street, Suite 608
Philadelphia PA  19103
(215) 564-2031