IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **BRYAN R. KATZ,** *et al.,* | : | |
| *Plaintiffs* | : | **CIVIL ACTION** |
| v. | : | |
| | : | |
| **TIMOTHY S DELUCA,** *et al.,* | : | |
| *Defendants* | : | **No. 23-1188** |

## <u>M E M O R A N D U M</u>

PRATTER, J.                                                                          MAY *13ᵗʰ*, 2024

    We can only play the cards we are dealt, and the plaintiffs in this case were dealt a $2,000 breach-of-contract action. As part of a $725,000 real estate transaction, Bryan Katz and Kristine Concepcion unexpectedly incurred a roughly $2,000 fee that allegedly should have been covered by either the seller or their title insurer. Frustrated by the inaction of their title insurer, they brought suit. However, the plaintiffs have breathtakingly overstated the scope of their claims. This straightforward case concerning a relatively modest sum has yielded a 104-page, 410-paragraph second amended complaint alleging over $75,000 in damages, most of which come in the form of unreasonably high attorneys' fees, and 12 counts, including four violations of the Real Estate Settlement Procedures Act and one violation of the Racketeer Influenced and Corrupt Organizations Act.

    The Court is unmoved by this effort to transform a simple contractual dispute into a complex and highly speculative conspiracy. The cards are down, and they are not hard to decipher. Because the Court lacks jurisdiction over $2,000 breach-of-contract cases, and the plaintiffs' federal claims either fail to state a claim or are time-barred, the Court dismisses this case for lack of subject matter jurisdiction.

## BACKGROUND

Brian Katz and Kristine Concepcion bought property in Haddonfield, New Jersey in 2020. They signed an "Agreement of Sale" for the property on October 19, 2020, and the non-party seller, Timothy DeLuca,[1] signed the following day. Closing occurred on December 7, 2020.

The plaintiffs engaged defendant CC Philly Real Estate Realty, which does business as Keller Williams Philly ("KW Philly"), as their broker, and KW Philly referred the plaintiffs to Great American Abstract, LLC ("Great American") for title insurance and escrow services. Upon making the referral, KW Philly disclosed that it "may have a business relationship with Great American" on an Affiliated Business Disclosure Form that also listed Great American's rates and stated in clear, capitalized language that the buyers did not have to hire Great American. Mr. Katz and Ms. Concepcion signed this disclosure form and hired Great American.

Before selling the property at issue to the plaintiffs, Mr. DeLuca had made improvements to the property, adding to its value. New Jersey assesses an Affordable Housing Development Fee, which taxes developers when their construction work adds value to New Jersey properties. When Mr. DeLuca paid the associated Affordable Housing Development Fee on October 15, 2020, the amount he paid towards that fee—$2,500—was allegedly a "bogus" underestimate. Great American discovered that the Affordable Housing Development Fee had been underpaid by performing a "tax and assessments search" on October 21. This search disclosed that $4,507.81 was still outstanding on the Affordable Housing Development Fee.[2] However, this $4,500 fee is *not* the subject of the present action: Mr. DeLuca paid that fee in November 2020.

---

[1] Mr. DeLuca was named as a defendant in the plaintiffs' first two complaints, but he was not named as a defendant in the operative Second Amended Complaint.

[2] This search also disclosed that additional taxes worth an approximate combined $30,000 also remained outstanding on the property. Mr. DeLuca paid these outstanding taxes on October 28, 2020.

The plaintiffs seem to aver that the $4,500 discovered by Great American's tax and assessments search should have put Great American and KW Philly on notice of the fact that, in the future, there would be a further, additional tax assessment under the Affordable Housing Development Fee. *See* Second Am. Compl. ¶¶ 137–39, Doc. No. 39 (hereinafter "SAC"). Because Great American was allegedly the "in-house" title company for KW Philly, and Great American and KW Philly "regularly conduct business in the State of New Jersey," the plaintiffs aver that both entities had either actual or constructive knowledge of the outstanding Affordable Housing Development Fee after Great American's tax and assessments search. Still, neither Great American nor KW Philly informed the buyers of the results of Great American's tax and assessments search, even though they were in contact with the buyers about other matters relating to an inspection. The defendants did, however, instruct Mr. DeLuca to satisfy all outstanding obligations on the property, and on November 20, Mr. DeLuca complied and paid the $4,507.81 owed under the Affordable Housing Development Fee.

At closing on December 7, 2020, the buyers were presented with a "uniform combined settlement statement." This document included various charges and taxes, but it did not mention that an additional $2,062.47 was owed under the Affordable Housing Development Fee. This is because a tax collector for the Borough of Haddonfield did not generate an invoice reflecting that $2,067.47 was still due under the Affordable Housing Development Fee until two days *after* closing, on December 9. The plaintiffs nonetheless maintain that KW Philly and Great American should have been aware of that forthcoming invoice before it was produced.

Mr. DeLuca was notified of this outstanding $2,062.47 fee by a letter he received on December 31. Mr. DeLuca also confirmed the existence of this outstanding fee with the Borough's tax collector by phone. Mr. DeLuca informed the tax assessor that Great American had handled

the title transfer, and on January 4, 2021, Great American was informed of the outstanding Affordable Housing Development Fee.

Mr. DeLuca had clearly refused to pay the $2,000 fee by February 22. On February 25, the plaintiffs first asked Great American to indemnify them for this fee. By March 9, 2021, the plaintiffs had expressly made a claim with Great American for coverage of the $2,000 fee. The plaintiffs also contend that Great American was contractually bound to retain an attorney to compel the payment of this fee by Mr. DeLuca.

Great American did not respond to the plaintiffs' communications for months. However, after the plaintiffs received a second delinquency notice in mid-June and sent it to Great American, Great American contacted Mr. DeLuca and threatened to retain an attorney to recover the fee. That same day, an employee of Great American sent Mr. Katz an email, stating: "I believe that this would be covered by a claim – I will check in on that and get back to you."[3] Between June 2021 and April 2022, the plaintiff-buyers sent Great American quite a few emails about this outstanding fee, to which Great American was not consistently responsive. The upshot of these communications is that Mr. DeLuca did not pay, and Great American neither followed up on its threat to retain an attorney nor covered the outstanding fee itself. In October 2022, the plaintiff-buyers retained counsel, who also emailed Great American about the Affordable Housing Development Fee to no avail.

Dissatisfied with Great American's response, the plaintiffs filed the present lawsuit in March 2023. The plaintiffs' original complaint named three defendants—Mr. DeLuca, DJSE

---

[3] The second amended complaint materially mischaracterizes this email by averring that Great American sent an email, "acknowledging that it would 'be [a] covered . . . claim' under the terms of the contract for insurance as contained in the E&O Agreement." Second Am. Compl. ¶ 168, Doc. No. 39 (hereinafter "SAC") (alterations in original). This averment simply does not reflect the actual contents of that email, which are quoted in relevant part above. *See also* Email of June 15, 2021, Ex. 24, Doc. No. 39-6.

Equities, and Great American—and alleged three counts—common law fraud, one violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), and breach of an insurance contract. The plaintiffs filed their first amended complaint in May 2023 and, for the first time, alleged violations of the Real Estate Settlement Procedures Act (RESPA). The operative pleading in this matter is the plaintiffs' second amended complaint, which names only KW Philly and Great American as defendants. The second amended complaint avers 12 counts: (1) Breach of Insurance Contract against Great American, (2) Insurance Bad Faith against Great American, (3) Violations of Pennsylvania's Unfair Trade Practices and Consumer Protection Law (UTPCPL) against Great American, (4) Breach of Fiduciary Duty against Great American, (5-7) three Violations of RESPA against Great American, (8) Enterprise/Triangular Liability against KW Philly, (9) Violations of the Pennsylvania UTPCPL against KW Philly, (10) Breach of Fiduciary Duty against KW Philly, (11) Violations of RESPA against Great American and KW Philly, and (12) RICO Violations against Great American and KW Philly.

KW Philly and Great American filed motions to dismiss the second amended complaint, and the Court held oral argument on these motions in November 2023. The Court grants the motions to dismiss insofar as they request dismissal of the plaintiffs' federal claims and finds that the plaintiffs have failed to plead jurisdictional damages sufficient to invoke the Court's diversity jurisdiction. The Court declines to take supplemental jurisdiction over the plaintiffs' state-law claims and dismisses this case for lack of subject matter jurisdiction.

## LEGAL STANDARD

Pleadings in federal court must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although "Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 678–79 (2009). Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

At the motion to dismiss stage, the Court must generally accept factual allegations contained in the complaint as true, but the Court is "not compelled to accept unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) (internal citations and quotation marks omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S at 678 (internal quotation marks and citation omitted). A complaint that "tenders 'naked assertion[s]' devoid of 'further factual enhancement'" does not suffice. *Id.* (alterations in original) (quoting *Twombly*, 550 U.S. at 557).

A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. This plausibility standard "require[s] a pleading to show 'more than a sheer possibility that a defendant has acted unlawfully[.]'" *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (quoting *Iqbal*, 556 U.S. at 678). Thus, "[p]leading facts that are merely consistent with liability stops short of the line between possibility and plausibility of entitlement to relief." *Lemons v. Meguerian*, No. 23-1090, 2024 WL 1328311, at *2 (3d Cir. Mar. 28, 2024) (internal quotation marks omitted) (quoting *Connelly*, 809 F.3d at 786). Determining plausibility is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Connelly*, 809 F.3d at 786–87 (quoting *Iqbal*, 556 U.S. at 679).

DISCUSSION

## I.   RICO

### A.   <u>The Putative RICO Scheme</u>

The plaintiffs appear to allege a two-part scheme that putatively violates RICO. The first part centers on the referral of Great American for title insurance. Specifically, the complaint asserts that KW Philly failed to adequately disclose its business relationship with Great American when it referred the plaintiffs to Great American. *See* SAC ¶ 344, Doc. No. 39. The Affiliated Business Disclosure Form presented to Mr. Katz and Ms. Concepcion was supposedly inadequate because: (1) it stated that KW Philly "*may have* a business relationship with Great American" instead of stating that KW Philly "*has*" such a business relationship and (2) the document failed to disclose KW Philly's so-called "ownership interest" in Great American. *Id.* ¶¶ 330(a), 330(c). According to the plaintiffs, this relationship between KW Philly and Great American caused both entities to look out for one another's interests over the course of this real estate transaction instead of either defendant looking out for the plaintiffs' interests. *See id.* ¶ 344. This relationship is problematic because it "resulted in a reduction of the number of fiduciaries that were supposed to be looking out for the Plaintiffs' interests from two fiduciaries to zero[.]" *Id.* ¶ 341. This fiduciary-reduction model is part one of the allegedly two-part scheme.

Part two centers on the title insurance policies Great American issued, but it also involves non-party Stewart Title, a Texas company that is "not involved in the insurance obligations at issue in this action." *Id.* ¶ 29. Great American is allegedly "a duly appointed title agent of Stewart Title." *Id.* ¶ 30. Great American allegedly issues title insurance policies belonging to non-party Stewart Title "under the false promises of actually providing indemnity protection for the buyers[,] . . . which was a scheme to obtain money or property from KW Philly's buyer clients by false pretenses." *Id.* ¶ 347. Basically, the plaintiffs aver that Great American issued title insurance

7

policies that it never intended to honor. At some point, the plaintiffs bought one of these policies—a so-called "owner's policy"—from Great American, and Great American allegedly did not intend to honor it. *See id.* ¶¶ 349, 354, 356, 358–60. The plaintiffs contend that the "transmission of the Affiliated Business Disclosure Form" and the "solicitation of the owners' policy" each constitute wire fraud, and that they constitute the "Defendants' regular way of doing business[.]" *Id.* ¶¶ 361–62.

These fiduciary-reduction and title insurance scenarios are said to be "sufficiently related to be considered a single pattern of racketeering activities." *Id.* at 92. These schemes are allegedly related because KW Philly's referral to Great American, which supposedly led KW Philly to have "divided loyalties," came close in time to the inquiry concerning whether the plaintiffs wanted an owner's policy. *See id.* ¶¶ 344, 366–67. The plaintiffs aver that neither of the defendants intended to assume the risks involved in either being a title agent or being a party to an owner's policy. *See id.* ¶ 368.

The winding complaint continues by asserting that another non-party, namely World Wide Land Transfer (WWLT), is also part of this grand scheme. *Id.* ¶ 372. Vaguely, KW Philly and Great American are said to be "associated with" WWLT, and these three entities all "participated in the affairs" of the others. *Id.* ¶ 370–77. This association has been going on since "about September of 2016," when KW Philly and Great American "realized that they could create synergies and reduce various overhead expenses by utilizing technological innovations to streamline workflows and specifically created an administrative nexus above both sister companies," presumably WWLT. *Id.* ¶¶ 378–79. This grand scheme allegedly involves the "funneling" of "profits," *id.* ¶ 381, the "synergizing" of "work-flows," *id.* ¶ 382, "unlawful kickbacks to KW Philly including . . . rental payments for . . . office space," *id.* ¶ 387, "increas[ing]

profit margins by recommending . . . bogus owner's policies," *id.* ¶ 388, and "allow[ing] Great American to deal with the unpleasant work of misleading the Plaintiffs . . . so as to avoid discovery of the false promises and underlying fraudulent conduct" *id.* ¶ 389.

Great American has allegedly been concealing this grand scheme ever since the discovery of the $2,000 Affordable Housing Development Fee. According to the plaintiffs, every communication they or their attorney have received from Great American since February 22, 2021, has constituted wire fraud in furtherance of this conspiracy. *See id.* ¶¶ 391–400. Finally, and astonishingly, the plaintiffs aver that almost every action taken by KW Philly and Great American to defend against this lawsuit has been a fraud upon the Court in furtherance of this conspiracy. *See id.* ¶¶ 401–09.

### B. Elements of Civil RICO

The Court begins by discussing the "principles" of RICO "implicated by the complaint." *Iqbal*, 556 U.S. at 675; *see Twombly*, 550 U.S. at 553–54. Next, the Court turns to the second amended complaint and is guided by "[t]wo working principles". *See Iqbal*, 556 U.S. at 678–79. The Court "begin[s] by identifying pleadings that, because they are no more than [legal] conclusions, are not entitled to the assumption of truth." *Id.* at 679. Second, the Court turns to the "well-pleaded factual allegations," "assume[s] their veracity," and "determine[s] whether they plausibly give rise to an entitlement to relief." *Id.* This analysis is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* (citation omitted).

A plaintiff alleging a civil RICO claim must allege: "(1) conduct, (2) of an enterprise, (3) through a pattern (4) of racketeering activity as well as [(5)] an injury resulting from the offensive conduct." *Berger v. Hahnemann Univ. Hosp.*, No. 17-2295, 2017 WL 5570340, at *7 (E.D. Pa. Nov. 17, 2017) (citing *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)). "Racketeering

activity" includes mail and wire fraud as defined by 18 U.S.C. §§ 1341 and 1343. *See* 18 U.S.C. § 1961(1). To establish a claim for mail or wire fraud, a plaintiff must allege: "(1) a scheme to defraud; (2) the use of the mails or wires for the purpose of executing the scheme; and (3) fraudulent intent." *Rapid Circuits, Inc. v. Sun Nat. Bank*, No. 10-6401, 2011 WL 1666919, at *23 (E.D. Pa. May 3, 2011) (citing *United States v. Pharis*, 298 F.3d 228, 234 (3d Cir. 2002)). When mail and wire fraud are the alleged predicate acts of a RICO violation, "they must be pled with particularity to satisfy Federal Rule of Civil Procedure 9(b); in particular, blanket allegations of mail and wire fraud lacking information of who sent or received the fraudulent representations are insufficient to satisfy Rule 9(b)." *Id.* at *23 (citing *Banks v. Wolk*, 918 F.2d 418, 422 n.1 (3d Cir. 1990)). Rule 9(b) explains, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Permission to allege intent "generally" pursuant to Rule 9(b) "merely excuses a party from pleading . . . intent under an elevated pleading standard. It does not give him license to evade the less rigid—though still operative—strictures of Rule 8." *Iqbal*, 556 U.S. at 686–87 (citing C. Wright & A. Miller, Federal Practice & Procedure § 1301, p. 291 (3d ed. 2004)).

In order to establish a *pattern* of racketeering activity, plaintiffs must plead "at least two acts of racketeering activity." 18 U.S.C. § 1961(5). The Supreme Court has explained that, in order to demonstrate "a pattern of racketeering activity[,] a plaintiff . . . must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989). With respect to relatedness, the alleged predicate acts must have similar "purposes, results, participants, victims, or methods of commission." *Id.* at 240. With respect to continuity, the alleged predicate acts must demonstrate

10

"repeated conduct that must have occurred over a substantial, closed period of time or allegations of conduct that constitutes a threat of continuing criminal action." *Rapid Circuits*, 2011 WL 1666919, at *23 (citing *H.J. Inc.*, 492 U.S. at 240–42). A "closed period of time" means that the "predicate acts took place over more than just a day, or even just a week." *Id.* (citing *H.J. Inc.*, 492 U.S. at 242). Alternatively, "a plaintiff can meet the continuity test by plausibly alleging a threat of continued criminal conduct." *Id.* (citing *Tabas v. Tabas*, 47 F.3d 1280, 1295 (3d Cir. 1995)).

### C. The Putative RICO Scheme Does Not State a Civil RICO Claim

Upon careful consideration of the second amended complaint, the Court concludes that there is not sufficient factual matter to plausibly allege a civil RICO claim. In other words, "the plaintiffs here have not nudged their [RICO] claims across the line from conceivable to plausible[.]" *Twombly*, 550 U.S. at 570. As an initial matter, the second amended complaint contains many legal conclusions that are not entitled to the assumption of truth at the motion to dismiss stage. For example, the plaintiffs repeatedly make conclusory allegations about the defendants' supposedly fraudulent intentions. *See, e.g.*, SAC ¶ 354, Doc. No. 39 (asserting that, when plaintiffs were asked to buy an owners' policy, "both Great American and KW Philly, knew and were aware, that Great American had no intention of . . . assuming any additional risks[.]"); *id.* ¶ 358 ("[T]he solicitation and sale of the owners' policy was, at its inception, nothing more than a fraudulent scam to bilk additional money out of the Plaintiffs and other buyers similarly situated for additional services that were not actually performed, *and were never intended to be performed.*") (original emphasis); *id.* ¶ 361 (asserting that the referral of Great American and the solicitation of the owners' policy "were intended by the Defendants' (sic) to have been transmitted via the wires for the purposes of executing on this" fraud.); *id.* ¶ 403 (asserting without evidence that Defendants, through the "concealment or alteration" of seven discrete documents, had "the intent to impair its integrity or availability for use in these proceedings[.]"); *id.* ¶ 407 ("Defendants

11

further intended and did, in fact, double down on their egregious efforts to distort reality and justify their unlawful conduct that is obviously fraudulent[.]"). Notwithstanding these conclusory allegations about the defendants' intent, "the Federal Rules do not require courts to credit a complaint's conclusory statements without reference to its factual context." *Iqbal*, 556 U.S. at 686.

Here, the plaintiffs have alleged and re-alleged that Great American and KW Philly had the intent to defraud them, but these repetitions merely recite one of the elements of a claim for mail or wire fraud, which is insufficient to plead that element. *Compare Rapid Circuits*, 2011 WL 1666919, at *23 (explaining that "fraudulent intent" is an element of mail and wire fraud), *with Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The Court does not assume these conclusory statements about the Defendants' fraudulent intent to be true.

The plaintiffs also make conclusory allegations regarding racketeering activity. A scheme to defraud may be adequately pled by alleging "some sort of fraudulent misrepresentation or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension." *Id.* (quoting *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1415 (3d Cir. 1991)). The plaintiffs assert that one instance of mail or wire fraud occurred when KW Philly transmitted the Affiliated Business Disclosure Form to the plaintiffs. SAC ¶ 361, Doc. No. 39. Although the plaintiffs argue that this form failed to comply with certain statutory requirements contained in RESPA, *see id.* ¶ 330, their tortured argument that this Affiliated Business Disclosure Form also constitutes mail or wire fraud is ultimately conclusory. To make this strained argument, the plaintiffs seize on language from a different form—namely a form "Consumer Information Statement" regarding "Real Estate Relationships in New Jersey"—stating that KW Philly "has fiduciary duties to the buyer which include[] . . . undivided loyalty[.]" *Id.*, Ex. 2A. Because KW Philly has a business

12

relationship with Great American, though, the plaintiffs assert that the former's referral of the latter "caused KW Philly to have 'divided loyalties.'" *Id.* ¶ 344. According to the plaintiffs' imprecise theory, "in light of the synergized business processes" of KW Philly and Great American, the effect of this referral was to deprive Mr. Katz and Ms. Concepcion of a fiduciary. *Id.* The plaintiffs conclude from this alleged state of affairs that, as a matter of law, the Affiliated Business Disclosure Form "constitutes a 'scheme or artifice to defraud.'" *Id.* The Court, however, need not accept this conclusory allegation as true.

The plaintiffs appear to be laboring under the incorrect assumption that an alleged breach of contract implies that the breaching party must have fraudulently entered into the contract in the first place. To be clear, the Court takes no position regarding whether KW Philly breached either a contract or any fiduciary duty it may have owed to the plaintiffs. Nonetheless, the plaintiffs' tortured argument merely (a) identifies an alleged contractual term—namely the phrase "undivided loyalty"—and (b) alleges that KW Philly has failed to abide by that contractual term. Although these allegations might constitute common law claims for breach of either a contract or a fiduciary duty (or both), they do not create a claim for mail or wire fraud. Critically, the plaintiffs have not managed to allege any "misrepresentation or omissions reasonably calculated to deceive[.]" *Rapid Circuits*, 2011 WL 1666919, at *23. Even assuming, as the plaintiffs contend, that the Affiliated Business Disclosure Form used by KW Philly was inadequate under the technical requirements of RESPA, it simply does not follow from this alleged noncompliance with a statutory disclosure requirement that this noncompliance also constitutes *fraud*. Individuals can non-fraudulently run afoul of the law.

The complaint fails to plead factual content sufficient to show that the Affiliated Business Disclosure Form was fraudulent. Apparently to demonstrate that the Affiliated Business

Disclosure Form constitutes fraud, the complaint opines: (i) that it would be preferable for the Affiliated Business Disclosure Form to say that KW Philly "has," rather than "may have," a business relationship with Great American; (ii) that the form should have hewn more closely to a model form contained in an appendix to the Code of Federal Regulations; and, most circuitously, (iii) that, because non-party WWLT allegedly owns 40% of Great American, and KW Philly is somehow vaguely associated with WWLT, KW Philly should have disclosed that it had a so-called "substantial membership interest" in Great American that caused KW Philly to owe Great American "duties of loyalty." *See* SAC ¶¶ 330(a)–(d), 375, Doc. No. 39. It simply does not follow from this bundle of creative propositions that KW Philly defrauded Mr. Katz and Ms. Concepcion. KW Philly gave the plaintiffs a form that put them on notice of the fact that KW Philly and Great American are in business together. The plaintiffs were clearly on notice where the form contains the phrase "Affiliated Business Disclosure" emblazoned across the top in bold, red letters. *Id.*, Ex. 3.

Taking a step back from the plaintiffs' nit-picking about the use of a modal verb and the defendants' arguable failure to precisely mimic an appendix to regulations implementing RESPA, the form clearly discloses that KW Philly and Great American have a business relationship. If they did not have such a relationship, it is entirely unclear what affiliated business this "Affiliated Business Disclosure" existed to disclose. Moreover, the plaintiffs' unwarranted legal conclusion that KW Philly owes a duty of loyalty to Great American is based on nothing more than speculative, vague statements about a hypothetical affiliation between KW Philly, Great American, and third-party WWLT. The Court need not accept that legal conclusion about the existence of a duty as true, and the complaint lacks factual content that would cause the Court to conclude that KW Philly is a fiduciary of Great American. There is simply nothing about the

Affiliated Business Disclosure Form that can plausibly be characterized as a "misrepresentation or omission[] reasonably calculated to deceive" Mr. Katz and Ms. Concepcion. *Rapid Circuits*, 2011 WL 1666919, at \*23. The transmission of that form was not an instance of mail or wire fraud.

The plaintiffs' further allegations regarding predicate acts of mail or wire fraud similarly contain legal conclusions that are not supported by the facts alleged. First, the plaintiffs aver that a February 22, 2021 email from an employee of Great American to the Haddonfield Borough tax assessor "fraudulently mischaracterized the [Affordable Housing Development] Fee as a variation of the taxes for 2020," which "constitutes an artifice to defraud" because it supposedly misled the tax collector into thinking the plaintiffs were responsible for the fee. SAC ¶¶ 391–94, Doc. No. 39. However, the Court has carefully reviewed the email chain at issue,[4] and the Great American employee accused of mischaracterizing the fee as a "variation of the taxes for 2020" simply said nothing of the sort. *See id.*, Ex. 19. The February 22, 2021 emails were not an instance of mail or wire fraud.

Second, the plaintiffs aver that, on February 25, 2021, the same Great American employee "sent additional emails . . . that were again designed to fraudulently mischaracterize the Fee" and thereby committed mail or wire fraud. *Id.* ¶¶ 395–96. However, the Court has carefully reviewed this email chain and again concludes that there is no evidence of any fraudulent mischaracterizations. The Great American employee simply explains why Great American might not cover the Affordable Housing Development Fee, writing: "My understanding when I spoke to Megan in the tax office [w]as that the taxes were issued post-closing for the improvements on the land, not that they were issued prior to closing. As it stands, we paid in full anything that was

---

[4]       "In evaluating a motion to dismiss, [the Court] may consider documents that are attached to or submitted with the complaint, and any matters incorporated by reference or integral to the claim[.]" *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (internal quotation marks omitted).

outstanding at the time of closing." *Id.*, Ex. 20. Based on the allegations contained in the complaint, this email states the truth: the additional fee was assessed two days after closing, and all other outstanding taxes that were actually revealed by Great American's title and assessments search had been paid at the time of closing. Thus, the February 25, 2021 emails were not an instance of mail or wire fraud.

Third, the plaintiffs aver that, on March 9, June 15, and August 6, 2021, Great American committed mail or wire fraud by sending emails "falsely representing that they would retain their own attorney to compel payment" from the sellers. *Id.* ¶¶ 397–98. These representations were allegedly "designed to delay or avoid performance of their [contractual] obligations . . . and in furtherance of [the] underlying conspiracy to allow the Defendants to continue with their illegal business practices undisturbed." *Id.* ¶ 398. Notwithstanding these conclusory statements about Great American's fraudulent intent, which the Court does not assume to be true, the only factual content before the Court consists of: (i) Great American sent emails stating that it would retain an attorney, *see id.*, Exs. 23–27; (ii) Great American's contract with the plaintiffs may have required Great American to retain an attorney under certain circumstances, *see id.*, Ex. 12; and (iii) Great American did not retain an attorney under the circumstances of this case. The emails in which Great American unilaterally states that it planned to retain an attorney do not constitute a binding agreement, and there is considerable controversy between the litigants regarding what was actually required by the allegedly binding agreements entered into between the plaintiffs and the defendants. *See* Mem. of L. in Supp. of Mot. to Dismiss of Def. KW Philly 19–23, Doc. No. 41-2; Mem. of L. in Supp. of Mot. to Dismiss of Def. Great American 4–7, Doc. No. 40-1. Such disagreements over the scope of contractual obligations are typical of breach-of-contract disputes. However, the Court is reluctant to conclude that, when a party to a contract informs the other party

that it intends to perform a contractual obligation but then breaches that obligation, the allegedly breaching party *defrauded* the other party through their communications. Such an inference would inappropriately conflate the common law of contract with the civil RICO statute, but:

> [t]he Third Circuit has resisted efforts to generate RICO claims from "garden variety" [common law claims], and that seems to be precisely what Plaintiff has attempted to do here. This is nothing more than a breach of contract claim that Plaintiff has unsuccessfully attempted to morph into a civil RICO claim.

*Klineburger v. Kell*, No. 16-5637, 2017 WL 1550013, at *9 (E.D. Pa. May 1, 2017) (citing *Banks v. Wolk*, 918 F.2d 418, 423 (3d Cir. 1990)). Great American's illusory statements that it would retain an attorney do not constitute mail or wire fraud.

Fourth, the plaintiffs contend that Great American "revive[d] its previous fraudulent scam of attempting to mischaracterize the Fee as a variation of the 2020 real estate taxes" after being contacted by plaintiffs' counsel in October 2022. SAC ¶ 399, Doc. No. 39. However, the employee who sent plaintiffs' counsel an email in October 2022 merely responded to counsel's demand email by requesting several documents referenced therein. *See Id.*, Ex. 32, Doc. No. 39-6. In fact, this email does not characterize the fee at all, much less fraudulently mischaracterize it. When the plaintiffs themselves consistently mischaracterize their own exhibits in order to plead a civil RICO claim, the plausibility of that civil RICO claim steadily erodes.

Audaciously, the plaintiffs finally contend that Great American and KW Philly committed further instances of mail and wire fraud by filing motions to dismiss in the present case and by generally engaging in the litigation process. *See id.* ¶¶ 401–02, 404–09, Doc. No. 39. Vaguely, they also contend that the defendants either concealed or altered several documents in this litigation. *Id.* ¶ 403. The plaintiffs' vague and conclusory allegations that the defendants have improperly defended themselves in this lawsuit are not entitled to the presumption of truth.

Defense counsel has done nothing that leads the Court to doubt their integrity, and the Court forcefully rejects the plaintiffs' tactic of making inflammatory accusations against them because they have defended their clients' interests. The defense lawyers in this case have engaged in no fraud that the Court can discern.

Finally, even if the Court assumed that these conclusory allegations did constitute instances of racketeering activity, the plaintiffs still would have failed to plead a *pattern* of racketeering activity. Two elements must be present to demonstrate a pattern of racketeering activity: relatedness and continuity. *H.J. Inc.*, 492 U.S. at 239. The alleged pattern of racketeering activity in this case began when KW Philly referred Great American to the plaintiffs. SAC ¶ 389, Doc. No. 39. After the disputed Affordable Housing Fee was discovered, the plaintiffs assert that almost every time the defendants or the defendants' lawyers communicated with them, their lawyer, or the Court about the disputed fee, they committed wire fraud. *See id.* ¶¶ 391–409. The plaintiffs again resort to conclusory statements by alleging that KW Philly's disclosure of its relationship with Great American and Great American's failure to honor insurance policies constitute the defendants' "regular way of doing business and design of their joint venture, [which] necessarily satisfies the definition of a 'pattern of racketeering activity' based on its open-ended continuity." *Id.* ¶¶ 346, 362. This is a legal conclusion that is not entitled to the presumption of truth.

Notwithstanding this legal conclusion, the plaintiffs have failed to plead facts demonstrating that this supposed racketeering activity was continuous. "Open-ended continuity occurs where past conduct projects into the future by its very nature with a threat of repetition." *Klineburger*, 2017 WL 1550013, at *8 (citing *H.J. Inc.*, 492 U.S. at 242). Open-ended continuity can be demonstrated where the predicate acts are the defendants' regular way of doing business. *Id.* (citing *H.J. Inc.*, 492 U.S. at 242). However, a plaintiff may not establish open-ended continuity

18

by generally alleging that the defendants' treatment of him is the defendants' regular way of doing business. *See, e.g., id.* (declining to presume as true the conclusory allegation that the defendant "has been involved in similar transactions . . . with the exact same end result[.]"); *Lickman v. Rivkin*, No. 3:05CV1793, 2006 WL 1744753, at *5 (M.D. Pa. June 21, 2006) ("Although the plaintiffs aver that the pattern of racketeering is defendants' regular way of doing business, we find that such a bare allegation is not sufficient."); *see also Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 729 (7th Cir. 1998) (holding that conclusory allegation that defendants also defrauded others is not enough to turn a singular instance of fraud perpetrated against the plaintiff into the requisite pattern). Here—with the possible exception of the Affiliated Business Disclosure Form, which was presented to the plaintiffs before the outstanding Affordable Housing Fee was assessed—every alleged predicate act was aimed at avoiding liability for the $2,000 fee. The plaintiffs assert, based on their limited experience with the defendants, that the defendants routinely conceal their business affiliation and decline to honor insurance policies. However, "[w]here a defendant's actions are narrowly directed to a single fraudulent goal and involve a limited purpose, these actions cannot, by themselves, underpin a pattern of racketeering activity." *Rapid Circuits*, 2011 WL 1666919, at *25 (citing *Kolar v. Preferred Real Est. Invs., Inc.*, 361 F. App'x 354, 365 (3d Cir. 2010)). Thus, even assuming that the plaintiffs plausibly pled non-conclusory factual content to establish that the alleged predicate acts of mail or wire fraud occurred (they have not), the plaintiffs still would have failed to plead non-conclusory facts demonstrating that these predicate acts constitute a pattern of racketeering activity.

The Court grants the defendants' motions to dismiss the plaintiffs' civil RICO claims.

### D. RESPA

The plaintiffs allege four discrete violations of 12 U.S.C. § 1607 of the Real Estate Settlement Procedures Act, or RESPA. Counts Five, Six, and Seven allege that Great American

violated § 2607(b), which states: "No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed." 12 U.S.C. § 2607(b). The plaintiffs emphasize the final six words of this provision—"other than for services actually performed"—and assert that Great American violated this provision in three ways. First, Great American allegedly violated § 1607(b) because the putative employees who performed title and escrow services for the plaintiffs were allegedly actually employees of WWLT, not Great American. *See* SAC ¶¶ 252–55, Doc. No. 39. Second, Great American allegedly violated § 1607(b) because it failed to pay the Affordable Housing Development Fee despite charging the plaintiffs an insurance premium. *See id.* ¶¶ 264–70. Third, Great American allegedly violated § 1607(b) because it charged the plaintiffs for an owner's policy but did not perform its obligations under that policy. *See id.* ¶¶ 278–82.

Count Eleven alleges that both Great American and KW Philly also violated § 2607(a), which explains: "No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person." 12 U.S.C. § 2607(a). The defendants allegedly violated this provision when KW Philly referred Great American to the plaintiffs, inadequately disclosed their affiliation, and received things of value from Great American for making the referral. *See* SAC ¶¶ 329–33. Although KW Philly provided the plaintiffs with an Affiliated Business Disclosure Form, the plaintiffs assert that this form was inadequate insofar as it failed to comply with the statutory requirements enumerated under § 2607(c)(4). *Id.* ¶¶ 329–30.

Claims under § 2607 must be brought within one year "from the date of the occurrence of the violation[.]" 12 U.S.C. § 2614. Closing on the Haddonfield property occurred on December 7, 2020, and the plaintiffs first made a claim under RESPA when they filed their first amended complaint in May 2023. The parties dispute what constitutes "the date of the occurrence of the violation" for determining RESPA's statute of limitations. The defendants primarily contend that any violation of RESPA would have occurred on the date of closing. By contrast, the plaintiffs repeatedly plead with respect to each RESPA allegation: "[a]lthough necessarily occurring over a period of time through a series of events and occurrences, the final occurrence of this violation was on or about October 7, 2022," when the plaintiffs' lawyer sent a demand letter to Great American. SAC ¶¶ 258, 271, 284, 334, Doc. No. 39.

The Third Circuit Court of Appeals has explained that RESPA's one-year statute of limitations "runs 'from the date of the occurrence of the violation,' which begins at the closing of the loan." *Cunningham v. M&T Bank Corp.*, 814 F.3d 156, 160 (3d Cir. 2016) (quoting 12 U.S.C. § 2614) (citing *In re Cmty. Bank of N. Va.*, 622 F.3d 275, 281 (3d Cir. 2010)); *see also Snow v. First Am. Title Ins. Co.*, 332 F.3d 356, 361 (5th Cir. 2003) ("[W]e create a simple and workable rule for the application of § 2614 by interpreting the phrase 'the date of the occurrence of the violation' as the date of the closing, which is a definite and indisputable date known to potential plaintiffs and defendants."); *Mullinax v. Radian Guar. Inc.*, 199 F. Supp. 2d 311, 325 (M.D.N.C. 2002) ("[T]he violation occurs and the limitations period begins once a borrower overpays for a settlement service[.]"). The closing in this case occurred on December 7, 2020, and the plaintiffs' first RESPA claim was made more than 29 months later, on May 23, 2023.[5] In the year preceding

---

[5]     The plaintiffs' sole RESPA claim made in March 2023 was brought under § 2607(a). *See* First Am. Compl. ¶ 320, Doc. No. 9. The claims brought under § 2607(b) were not brought until August 25, 2023, when the plaintiffs filed the second amended complaint.

the filing of the plaintiffs' first RESPA claim, only one thing is pled to have happened: the plaintiffs' lawyer sent Great American a demand letter, and Great American declined to acquiesce. The plaintiffs have cited no authority for the proposition that this exchange constitutes "the occurrence of the violation" under RESPA. Their RESPA claims are thus time-barred.

The plaintiffs and defendants agree that equitable tolling would be inappropriate here.[6] *See* Mem. of L. in Opp. to Mot. to Dismiss of Def. Great American 12, Doc. No. 50 ("Great American argues that Plaintiffs have not pled necessary elements to show that equitable tolling would apply notwithstanding the fact that Plaintiffs['] [second amended complaint] was specifically amended to not rely on that doctrine."). The Court agrees that equitable tolling is not appropriate here, noting that "[e]quitable tolling is a rare remedy to be applied in unusual circumstances, not a cure-all for an entirely common state of affairs." *Wallace v. Kato*, 549 U.S. 384, 396 (2007).

The plaintiffs' RESPA claims are time-barred, and the motions to dismiss are granted insofar as they move to dismiss Counts Five, Six, Seven, and Eleven of the second amended complaint.

## II.   Jurisdictional Damages

The Court lacks subject matter jurisdiction over the plaintiffs' state-law claims because the plaintiffs have not pled jurisdictional damages. Although the plaintiffs previously invoked the Court's diversity jurisdiction and imprecisely averred a wide array of damages they believe to be

---

[6]   Peculiarly, the plaintiffs argue that the defendants are "equitably estopped from asserting a statute of limitations defense," relying primarily on excerpts from a 1990 case from the Seventh Circuit Court of Appeals that distinguished between equitable estoppel and the fraud-specific discovery rule. *See* Mem. of L. in Opp. to Mot. to Dismiss of Great American 43–44, Doc. No. 50. The elements of equitable estoppel are "(1) a misrepresentation by another party; (2) which [he] reasonably relied upon; (3) to [his] detriment." *Leese v. Adelphoi Vill., Inc.*, 516 F. App'x 192, 194 (3d Cir. 2013) (quoting *United States v. Asmar*, 827 F.2d 907, 912 (3d Cir. 1987)). As discussed at length in the context of the plaintiffs' RICO claim, the plaintiffs have not pled facts demonstrating that Great American has actually made a misrepresentation at all, much less one upon which the plaintiffs could reasonably rely. The defendants are not equitably estopped from asserting a meritorious statute of limitations defense.

recoverable in this case, SAC ¶¶ 10–11, Doc. No. 39, the plaintiffs have since filed a so-called "Notice of Voluntary Dismissal of State Law Counts," which purports to withdraw the plaintiffs' state law claims pursuant to Federal Rule of Civil Procedure 41(a). Notice of Voluntary Dismissal 1, Doc. No. 58. The plaintiffs may not unilaterally dismiss their state law counts at this stage of the proceedings because Rule 41(a) only "provides a mechanism for a plaintiff to voluntarily dismiss an entire lawsuit . . . and . . . all of its claims against a particular party." *Noga v. Fulton Fin. Corp. Emp. Benefit Plan*, 19 F.4th 264, 271 n.3 (3d Cir. 2021). However, Rule 41(a) "does not apply where the plaintiff attempts to dismiss individual 'claims,'" because the rule applies only to "an action." *Waris v. Mackey*, No. 09-1103, 2009 WL 4884204, at *4 (E.D. Pa. Dec. 15, 2009) (citing *ECASH Techs., Inc. v. Guagliardo*, 35 F. App'x 498, 499 (9th Cir. 2002)). Thus, the plaintiffs cannot unilaterally withdraw only their state law claims from the present action.

Nonetheless, the state law claims do not appear to satisfy the amount-in-controversy requirement. The Court's concern regarding its jurisdiction is underscored by the fact that *no party* now maintains that the Court has subject matter jurisdiction over these claims, even though "[t]he burden of establishing federal jurisdiction rests with the party asserting its existence." *Lincoln Benefit Life Co. v. AEI Life, LLC*, 800 F.3d 99, 105 (3d Cir. 2015). The plaintiffs have now declared that it is "no longer worth the burden imposed upon them to continue to justify why their state law claims were properly before this Court[.]" Suppl. to Notice 6, Doc. No. 67; *cf. Kalick v. Nw. Airlines Corp.*, 372 F. App'x 317, 321 (3d Cir. 2010) ("At all stages of the litigation, [the plaintiff] has the burden to prove that his case is properly before a federal court."). And the defendants argue that the plaintiffs "have failed to plead facts establishing the required $75,000 jurisdictional amount for federal court." Mem. of L. in Supp. of Mot. to Dismiss of Def. KW Philly 23, Doc. No. 41-2; *see also* Mot. to Dismiss of Def. Great American 1, Doc. No. 40 (emphasis removed)

("This is a dispute over a charge for around two thousand dollars that belongs in small claims court, not the United States District Court for the Eastern District of Pennsylvania."). In the absence of any party to this litigation that seeks to establish the Court's jurisdiction, the Court independently determines that the plaintiffs have not pled over $75,000 in damages.

Federal district courts have jurisdiction over civil actions between "citizens of different states" when "the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs[.]" 28 U.S.C. § 1332(a). The Court has "an independent obligation to satisfy [itself] of jurisdiction if it is in doubt" and may sua sponte raise subject matter jurisdiction concerns. *Nesbit v. Gears Unlimited, Inc.*, 347 F.3d 72, 76–77 (3d Cir. 2003). When a federal court determines whether it has subject matter jurisdiction, it "may inquire into the jurisdictional facts without viewing the evidence in a light favorable to either party." *Id.* at 77. As the Supreme Court has explained:

> It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal . . . [I]f, from the face of the pleadings, it is apparent, to a legal certainty, that the plaintiff cannot recover the amount claimed or if, from the proofs, the court is satisfied to a like certainty that the plaintiff never was entitled to recover that amount, and that his claim was therefore colorable for the purpose of conferring jurisdiction, the suit will be dismissed.

*St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 289 (1938).

The plaintiffs aver that they might collect a laundry list of different types of damages: (1) the $2,062.47 owed under the Affordable Housing Development Fee; (2) lost revenues from the plaintiffs' dental practice; (3) refunds of the amounts they paid for title and escrow services; (4) "damages for certain mental and emotional injuries;" (5) "delay damages;" (6) "damages attributable to certain federal income tax obligations;" (7) treble damages pursuant to Pennsylvania's Unfair Trade Practices and Consumer Protection Law; (8) punitive damages; and

(9) attorneys' fees. SAC ¶ 11, Doc. No. 39. Many of these categories of damages are vaguely pled and conclusory in the first place, and it now appears that the plaintiffs have abdicated their burden of demonstrating jurisdictional damages altogether. Nonetheless, the Court addresses each averment in turn.

First, the Court agrees that the plaintiffs may be able to recover $2,062.47 based on the defendants' alleged failure to pay for the Affordable Housing Development Fee.

Second, the plaintiffs cannot collect lost revenues from their dental practice. As part of the real estate transaction here, Mr. Katz and Ms. Concepcion allegedly filled out some unspecified paperwork and disclosed that they run a dental practice together. *Id.* ¶ 186. Based on the existence of this paperwork alone, the plaintiffs assert that it was foreseeable to Great American that the plaintiffs' dental practice would be harmed if Great American failed to perform its alleged contractual obligation to cover a roughly $2,000 fee. *Id.* ¶ 187. As an initial matter, this assertion of foreseeability is a legal conclusion that is not entitled to the presumption of truth. Under some circumstances, consequential damages may be recoverable for a breach of contract, but "a party may only recover damages that were a *reasonably foreseeable* consequence of a breach at the time the contract was made." *DeHart v. HomEq Servicing Corp.*, 47 F. Supp. 3d 246, 256 (E.D. Pa. 2014) (citing Restatement (Second) of Contracts § 351(1)). Such "[d]amages are not recoverable for loss that the party in breach did not have reason to foresee as a *probable* result of the breach when the contract was made." Restatement (Second) of Contracts § 351(1) (emphasis added). The second amended complaint pleads no facts whatsoever from which the Court could infer that it was *reasonably* foreseeable to Great American that its alleged failure to cover a $2,000 fee in the course of a real estate transaction involving two dentists would *probably* result in lost revenues to the plaintiffs' dental practice. There is not a single fact alleged that relates the Affordable Housing

Fee to the plaintiffs' dental practice. The existence of a form upon which the plaintiffs wrote that they run a dental practice is insufficient. Thus, the plaintiffs may not recover lost profits from their dental practice in this lawsuit because this lawsuit appears to be entirely unrelated to the plaintiffs' dental practice.

Third, the plaintiffs appear to inexplicably contend that they can recover *both* the $2,000 fee that they were allegedly owed under the terms of their contract with Great American *and* the monies they paid to Great American pursuant to the same contract. In other words, they appear to contend that they can both require Great American to perform its alleged obligation under the contract while simultaneously being excused from performing their own. The Court is aware of no theory of damages pursuant to which the plaintiffs would be entitled to such a windfall, and the plaintiffs have abdicated their burden of providing one. The Court does not include this unspecified, inexplicable contention in its jurisdictional damages calculation.

Fourth, the plaintiffs assert that they are entitled to damages for the putative emotional distress that they suffered because of the defendants' alleged breach of contract. SAC ¶¶ 188–89, Doc. No. 39. However, as the Supreme Court recently held, "[i]t is hornbook law that 'emotional distress is generally not compensable in contract.'" *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 221–22 (2022) (citing D. Laycock & R. Hasen, Modern American Remedies 216 (5th ed. 2019)). The plaintiffs may not recover damages for emotional distress due to the defendants' alleged breach of contract.

Fifth, the plaintiffs assert that they could be entitled to "delay damages as authorized by 42 Pa. C.S. § 8371(1)." SAC ¶ 11, Doc. No. 39. In actions pertaining to insurance policies, "if the court finds that the insurer has acted in bad faith toward the insured, the court may . . . [a]ward interest on the amount of the claim from the date the claim was made by the insured in an amount

equal to the prime rate of interest plus 3%." 42 Pa. Cons. Stat. § 8371. Section 8371 is silent regarding how to calculate the "prime rate of interest plus 3%," but at least one federal district court has followed the procedures outlined in Pennsylvania Rule of Civil Procedure 238. *See Gallatin Fuels, Inc. v. Westchester Fire Ins. Co.*, No. 02-2116, 2006 WL 1666703, at *5 (W.D. Pa. Jun. 2, 2006). Rule 238 explains that delay damages are calculated "at the rate equal to the prime rate as listed in the first edition of the Wall Street Journal published for each calendar year for which the damages are awarded, plus one percent, not compounded." Pa. R. Civ. P. 238(a)(3). The Court evaluates the amount in controversy as of "the time that the complaint was filed." *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 395 (3d Cir. 2016). The original complaint in this action was filed on March 28, 2023, and the addendum to the explanatory comment to Rule 238 furnishes the prime rate as set forth in the first edition of the Wall Street Journal for all years applicable to the present case:

| Date of Publication | Prime Rate Percentage |
|---|---|
| January 2, 2020 | 4.75% |
| January 4, 2021 | 3.25% |
| January 3, 2022 | 3.25% |
| January 3, 2023 | 7.5% |

Pa. R. Civ. P. 238, Addendum to Explanatory Comment (2024). Even though the presiding judge in *Gallatin Fuels* only added the 3% required by § 8371, out of an abundance of caution the Court will add both the 1% required by Rule 238 and the 3% required by § 8371 to determine the applicable damages interest rate:

| Year | Damages Interest Rate |
|---|---|
| 2020 | 8.75% |
| 2021 | 7.25% |
| 2022 | 7.25% |
| 2023 | 11.5% |

Applying these rates results in the following interest on the $2,062.47 compensatory damages awards for each respective, relevant year.

### A. __Interest in 2020__

Daily interest on the outstanding Affordable Housing Development Fee at 8.75%, which equals $0.49, is calculated by multiplying $2,062.47 by the interest rate of 0.0875 and dividing the result by 365 days.

Assuming the breach occurred at closing on December 7, 2020, this interest accrued for 25 days. $0.49 times 25 days equals $12.36. Thus, plaintiffs could recover a maximum of $12.36 in interest based on § 8371 for the year 2020.

### B. __Interest in 2021 & 2022__

The damages interest rate was 7.25% for 2021 and 2022. $2,062.47 multiplied by the interest rate of 0.0725 equals $149.50. Because the interest rate was the same both years, $149.50 is multiplied by two, which equals $299. Thus, the plaintiffs could recover a maximum of $299 in interest based on § 8371 for the years 2021 and 2022 combined.

### C. __2023__

Daily interest on the outstanding Affordable Housing Development Fee at 11.5%, which equals $0.65, is calculated by multiplying $2,062.47 by the interest rate of 0.115 and dividing the result by 365 days.

There are 87 days between January 1, 2023 and March 28, 2023. $0.65 times 87 days equals $56.55. Thus, plaintiffs could recover a maximum of $56.55 in interest based on § 8371 for the year 2023.

Adding these amounts together, the maximum amount recoverable by the plaintiffs pursuant to § 8371 is $367.91.

Sixth, the plaintiffs vaguely assert that they are entitled to "damages attributable to certain federal income tax obligations that would be owed on certain recoveries in order to make the Plaintiffs whole as additional compensatory damages[.]" SAC ¶ 11, Doc. No. 39. This vague, conclusory assertion does little to assure the Court that it has jurisdiction over this case, especially now that the plaintiffs have abdicated their burden of demonstrating subject matter jurisdiction. However, the Court also recognizes that compensatory damages have been awarded on the basis of federal income tax obligations in other cases. *See, e.g., Phillips v. Starbucks Corp.*, No. 19-19432, 2023 WL 5274541, at *12–13 (D.N.J. Aug. 16, 2023). Thus, out of an abundance of caution, the Court will multiply the plaintiffs' actual damages of $2,062.47 by the highest federal income tax rate of 39.6% to determine the substance of this vague statement: no more than $816.74. *See* 26 U.S.C. § 1.

Seventh, the plaintiffs assert that they can recover "treble damages as authorized by 73 P.S. § 201-9.2." SAC ¶ 11, Doc. No. 39. However, treble damages under the UTPCPL "may not be included when calculating the threshold jurisdictional requirement." *Nottingham v. Nat'l Auto. Distrib. Network, Inc.*, No. 19-1618, 2010 WL 11707685, at *1 n.1 (E.D. Pa. Mar. 5, 2010) (citing *Rouse v. Nissan N. Am.*, No. 04-5320, 2005 WL 61449, at *3 (E.D. Pa. Jan. 10, 2005)). Thus, the treble damages available to the plaintiffs pursuant to Pennsylvania's UTPCPL are not included in the Court's jurisdictional damages calculation.

Eighth, the plaintiffs assert that they can recover punitive damages "as authorize[d] by common law" and by § 8371(2). As the Third Circuit Court of Appeals has explained, when a punitive damages claim "comprises the bulk of the amount in controversy and may have been colorably asserted solely or primarily for the purpose of conferring jurisdiction, that claim should be given particularly close scrutiny." *Packard v. Provident Nat. Bank*, 994 F.2d 1039, 1046 (3d

Cir. 1993) (citing *Zahn v. Int'l Paper Co.*, 469 F.2d 1033, 1033–34 n.1 (2d Cir. 1972), *aff'd*, 414 U.S. 291 (1973)). To determine whether the jurisdictional damages requirement has been satisfied, the Court "must examine what damages are recoverable under state law." *Muchler v. Greenwald*, 624 F. App'x 794, 798 (3d Cir. 2015).

Punitive damages are sometimes available under Pennsylvania law for breach of fiduciary duty,[7] *see Holland v. Physical Therapy Inst., Inc.*, 296 A.3d 619 (Table), at 8–9 (Pa. Super. Ct. 2023), and they are certainly available pursuant to Section 8371. 42 Pa. Cons. Stat. § 8371(2). However, the Supreme Court has explained that "few awards exceeding a single-digit ratio between punitive and compensatory damages will satisfy due process." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 410 (2003) ("Single-digit multipliers are more likely to comport with due process."); *see Neff v. Gen. Motors Corp.*, 163 F.R.D. 478, 483 (E.D. Pa. 1995) ("[A] party should not be permitted to shoehorn what is in truth a local action into federal court through extravagant punitive damage claims that are permitted only by virtue of the federal system's liberal pleading rules.").

Here, a punitive damages award of nine times the plaintiffs' actual damages of $2,067.42 is only $18,606.78—still far below the jurisdictional damages requirement. *See Berkery v. Metro. Life Ins. Co.*, No. 21-26, 2021 WL 229320, at *5 (E.D. Pa. Jan. 22, 2021) (multiplying compensatory damages by nine to determine maximum punitive damages award of "$10,800—far below the jurisdictional amount."); *see also Kalick*, 372 F. App'x at 321–22 (3d Cir. 2010) ("Even assuming that [Mr.] Kalick could recover . . . $2900, his maximum punitive damages would leave

---

[7]    In Pennsylvania, breach of fiduciary duty claims are subject to a two-year statute of limitations. 42 Pa. Cons. Stat. § 5524(7). The plaintiffs first brought claims for breach of fiduciary duty against the defendants on May 23, 2023. *See* First Am. Compl. ¶¶ 335, 342, Doc. No. 9. They now contend that, in January and February of 2021, Great American breached alleged fiduciary duties it owed to the plaintiffs. *See* SAC ¶ 246. It thus appears to the Court that these claims may be barred by the statute of limitations.

him well short of the amount in controversy requirement."). The plaintiffs' compensatory damages would need a multiplier of over thirty to even approach the jurisdictional damages threshold. Thus, although punitive damages may be available to the plaintiffs under Pennsylvania law, they are not available in a magnitude sufficient to satisfy the jurisdictional damages requirement.

The only remaining request is the plaintiffs' attorney's exorbitant request for over $100,000 in fees. In fact, the second amended complaint plainly pleads that attorneys' fees are the greatest sum at issue in this action: "the most significant component of the Plaintiffs' damages . . . are, at this point, the six figure attorney's fees that were incurred[.]" SAC ¶ 406, Doc. No. 39. Although the statute conferring diversity jurisdiction "excludes 'interests and costs' from the amount in controversy, attorney's fees are included where they are available to successful plaintiffs under the statutory cause of action," which they are under Section 8371. *Berkery*, 2021 WL 229320, at *5 (quoting *Alberty v. Nationwide Mut. Ins. Co.*, No. 05-1319, 2005 WL 8176235, at *3 (W.D. Pa. Oct. 25, 2005)). Adding all the foregoing sums together—and liberally assuming that the plaintiffs might recover the largest punitive damages award likely to comport with due process—the plaintiffs have averred jurisdictional damages to the tune of $21,853.90. To meet the jurisdictional damages requirement, the plaintiffs' attorney would need to be awarded at least $53,146.11. The actual damages in this case are $2,062.47. Thus, setting aside the plaintiffs' attorney's request for over $100,000 in fees and focusing only on meeting the jurisdictional damages threshold, the Court would need to award the plaintiffs' attorney over twenty-five times the plaintiffs' actual damages merely to meet that threshold. The Court can conclude to a legal certainty that it would not award over $50,000 in fees on a breach-of-contract action worth roughly $2,000. *Cf. Lerch v. Md. Ins. Grp.*, No. 94-5592, 1995 WL 30594, at *3 (E.D. Pa. Jan. 25, 1995) ("An estimate of $25,000 in

legal fees in pursuit of a $13,500 claim cannot be credited."). "To do so would be to reward overlawyering of the case." *Neff*, 163 F.R.D. at 484.

The plaintiffs have both failed to plead jurisdictional damages and expressly abdicated their responsibility of demonstrating that the Court has subject-matter jurisdiction. The Court has no choice but to dismiss this case.

### III.   Futility of Amendment

Amendment in this case would be futile. Courts ordinarily provide plaintiffs with leave to file an amended complaint when granting defendants' motion to dismiss in full. *Kurtz v. Westfield Ins.*, 610 F. Supp. 3d 703, 710 (E.D. Pa. 2022). However, the Court "may dismiss a complaint with prejudice when 'leave to amend would be futile.'" *Id.* (quoting *Lontex Corp. v. Nike, Inc.*, 384 F. Supp. 3d 546, 559 (E.D. Pa. 2019)). This is the plaintiffs' third complaint. After three attempts, the Court is certain both that the plaintiffs cannot state a claim under RICO and that their RESPA claims are time-barred. *Cf. id.* (quoting *In re Egalet Corp. Sec. Litig.*, 340 F. Supp. 3d 479, 514 (E.D. Pa. 2018)) ("Leave to amend is futile when 'the complaint, as amended, would fail to state a claim upon which relief could be granted.'"). Moreover, this roughly $2,000 breach-of-contract action cannot be transformed into a federal case by granting the plaintiffs leave to request even more creative species of damages. And the Court declines to take supplemental jurisdiction over the plaintiffs' state law claims.

### CONCLUSION

The plaintiffs have failed to state claims under either RICO or RESPA, and they have failed to plead jurisdictional damages. The Court dismisses this case for lack of subject matter jurisdiction. An appropriate order follows.

BY THE COURT:

_____

**GENE E.K. PRATTER**
**UNITED STATES DISTRICT JUDGE**

33